I, Roger C. Jennings, hereby declare as follows:

1. I am a professionally licensed real estate appraiser and work for the U.S. Army Corps of Engineers (USACE), Fort Worth District in Fort Worth, Texas. I have been employed by USACE as a real estate appraiser since March 2012. In this capacity, I perform appraisals and review appraisals produced by independent appraisers. Based on my review of appraisals performed by other appraisers, I either approve or reject the appraisals for use by USACE.

2. As an appraiser, I have extensive experience both in performing appraisals and reviewing appraisals in the Rio Grande Valley (RGV) where Tract RGV-MCS-1200 is located, and, therefore, I am very familiar with the RGV market. Within the past two years, I have performed more than 18 appraisals and 70 appraisal reviews in the RGV market.

3. In my capacity as an appraiser for USACE, I have analyzed temporary rights of entry (ROEs), which are obtained so government or private entities can conduct surveys, testing or other investigatory work needed to plan a proposed project. ROEs are minimal in scope and limited in time, and reserve to the landowner all rights and interests to use the property.

4. I was asked to analyze whether there is a measurable market value for ROEs to conduct surveying, testing and other investigatory work needed to plan the proposed construction of roads, fencing, lighting and other related infrastructure designed to help secure the U.S.-Mexico border in the Rio Grande Valley, Texas. As part of my analysis, I completed independent research of ROE acquisition data that USACE accumulated over the past 15 years. In two separate, but extensive projects, USACE obtained a substantial number of ROEs. The first project is the border wall construction project in the Rio Grande Valley, which is currently ongoing. At this point, USACE has obtained 533 ROEs as part of this project; however, there is no market value associated with this interest. In such situations, USACE may make an administrative decision to pay a nominal amount, but this does not reflect market value as there is none for a limited, temporary ROE that does not impact the underlying property or the landowner's use of the property. The same holds true for the Fort Polk Land Acquisition Project in Louisiana, which has been completed. For this project, USACE obtained 85 ROEs and,

GOVERNMENT
EXHIBIT

2

as with the Rio Grande Border Project, there was no measurable market value attributed to the ROEs.

5. During the course of my research, I also contacted the following market participants who have extensive experience in obtaining ROEs.

   a. I interviewed Johnny Colley, who currently works as a Realty Specialist for the Fort Worth USACE office.  Prior to his employment with USACE, Mr. Colley worked as a landman for several oil and gas companies over a seven-year time period.  During those seven years, Mr. Colley estimates that he acquired somewhere between 250 and 350 ROEs without any consideration compensation paid.  As Mr. Colley noted, the reason for this is that the ROE is temporary in nature, does not impact the property in any meaningful way, and the landowner retains all rights to use the property as it deems fit.  If there is any issue with a company's use for survey or investigatory work, the company can alter its schedule or planning to minimize any inconvenience to the landowner. In other words, there is no impact to the property and thus no measurable value associated with a ROE.

   b. I also contacted John Hastings of Hastings Consulting LLC in Clinton, Arkansas.  Mr. Hastings has extensive experience in dealing with obtaining ROEs in the oil and gas industry.  For the last 12 years, he has worked as a surface landman, field landman, and right of way supervisor in Arkansas, Colorado, Kansas, Oklahoma, and Texas.  He worked for more than seven years in Arkansas as a surface field landman acquiring properties for natural gas extraction. His team drilled and maintained over 1400 wells across numerous counties, sometimes requiring timber and pasture appraisals.  During this time, Mr. Hastings notes that no consideration compensation was paid for ROEs for the extensive survey activities undertaken during this project. If the property was deemed appropriate for extraction, based on survey and other investigation, the landowner was compensated for the property when it was acquired.  Mr. Hastings explained that although parties may seek to negotiate some consideration for ROEs, it is not based on market value because there is no measurable value associated with a ROE.

6. As part of my analysis, I also reviewed an appraisal performed by Stephen D. Roach, MAI, SRA California License # AG002159 and Cody F. Knox California License # AG011115 (hereinafter the "Roach Appraisal"). This appraisal is attached hereto as Exhibit A. The appraisers were employed by Jones, Roach & Caringella, Inc. Real Estate Valuation Consultants 2221 Camino Del Rio South, Suite 202 San Diego, California 92108. The appraisal was dated August 12, 2011. I developed an appraisal review and prepared a written report in compliance with applicable standards, including Standards Rules 3 and 4 of the Uniform Standards of Professional Appraisal Practice (2020-2021) and Section 3 of the Uniform Appraisal Standards for Federal Land Acquisitions (6th ed. 2016).

7. The subject parcel in the Roach Appraisal consisted of 242.93 acres, which contained no vertical improvements and was in raw condition although a portion of the subject had been graded. The interest to be acquired was a temporary right of entry lasting approximately one year to allow contractors for the Department of Homeland Security to conduct surveying and testing in relation to possible future improvement of an access route from existing public streets to Otay Mountain Truck Trail. In their professional opinion, Mr. Roach and Mr. Knox concluded that the temporary non-exclusive access easement for surveying and investigatory work had no measurable market value. In reaching this conclusion, the appraisers contacted numerous market participants who reported that there is no market value to a ROE to conduct investigatory work. Exhibit A at 47-48. The appraisers also analyzed potential interference with the use of the property and concluded there would be none. Exhibit A at 48-49. Mr. Roach and Mr. Knox concluded:

> In summary, the easement acquired does not change the uses for which the property is legally available, has no impact on any potential physically possible use of the property, and does not impair the use or sale of the property for any of the available uses. Further, we conclude there is no demonstrable market for similar rights of entry. Therefore, we determined that the subject right of entry easement has no measurable market value. Exhibit A at 50.

8. In reviewing the Roach Appraisal, I reached the following conclusions:

- o The Roach Appraisal appears to be complete and to meet the Uniform Standards of Professional Appraisal Practice and the Uniform Appraisal Standards for Federal Land Acquisitions.
- o The Roach Appraisal contains adequate information. The data in the report is relevant and appears reasonable.
- o The appraisal methods used in the report are appropriate.
- o Analysis, opinions and conclusions within the report under review appear to be appropriate and reasonable.

9. To analyze whether there is a measureable market value for temporary ROEs in the RGV, I first needed to determine whether the Roach Appraisal could be considered as part of my research and analysis. I concluded that the analysis, reasoning and methodology in the Roach Appraisal were relevant and appropriate to apply to the Rio Grande Valley market. The interest at issue is the same in either market – temporary ROEs to conduct investigatory work needed for planning purposes – and is treated the same in both markets. Market participants contacted both in the Roach Appraisal (in Southern California) and those contacted during my research (in Texas, as well as Arkansas, Colorado, Kansas and Oklahoma) confirmed that because a ROE is temporary in nature and does not impact or impair the use of the landowner's property, there is no measurable value associated with this interest.

10. Based on my review, analysis and experience, it is my opinion that there is no measurable value associated with ROEs. The ROEs are temporary in nature used to do investigatory work, such a surveying and testing, which are needed for planning purposes. USACE has obtained hundreds of ROEs for projects in RGV and throughout the country without concluding there is any measurable market value. Private market participants have also confirmed that there is no measurable value associated with ROEs as they are used for planning and do not impact the landowner's use of the property. In summary, it is my conclusion that the temporary, non-exclusive easement that was acquired in this case and for other border-security-related activities would not have any impact on the existing use or value of the underlying property. Therefore, there is no measurable value associated with a ROE.

11. With regards to the information provided in this statement, and the appraisal review report I submitted to my employer on the Roach Appraisal, I declare, pursuant to 28 U.S.C. § 1746, that the information is true and correct to the best of my knowledge, information and belief, under penalty of perjury. I further declare that this Declaration was executed on this 27th day of April, 2020 in Fort Worth, Texas.

JENNINGS.ROGE  Digitally signed by
                JENNINGS.ROGER.C.1395714577
R.C.1395714577  Date: 2020.04.27 09:18:59 -05'00'

Roger C. Jennings

US v. 242.93 Acres - Temporary Right of Entry

APPRAISAL REPORT

***US v. 242.93 ACRES***
***TEMPORARY RIGHT OF ENTRY***
***SAN DIEGO COUNTY, CALIFORNIA***

APPRAISED FOR

Mr. Brett Norris
U.S. Department of Justice
San Diego County Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893

DATE OF VALUATION

May 25, 2010

DATE OF REPORT

August 12, 2011

APPRAISED BY

Jones, Roach & Caringella, Inc.
2221 Camino del Rio South, Suite 202
San Diego, California  92108-3609
Our File No.: 2011048

EXHIBIT A

SHANNON L. CUTSINGER, MAI
WILLIAM N. PATTERSON, MAI, SRA
GALEN JUSTICE-BLACK
TREVOR C. HUBBARD, MAI, SRA
CODY F. KNOX

**JONES, ROACH & CARINGELLA, INC.**
REAL ESTATE VALUATION CONSULTANTS
2221 CAMINO DEL RIO SOUTH, SUITE 202
SAN DIEGO, CALIFORNIA 92108
(858) 565-2400   FAX: (858) 565-4916
*www.jrcvaluation.com*

ROBERT P. CARINGELLA, MAI
ROBERT N. JONES, MAI
STEPHEN D. ROACH, MAI, SRA

*Established 1986*

August 12, 2011

Mr. Brett Norris
U.S. Department of Justice
San Diego County Office
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893

Reference:    *US v. 242.93 Acres*

Dear Mr. Norris:

At your authorization and request, we have performed an appraisal in conjunction with the Department of Homeland Security's acquisition of a temporary right of entry over the referenced property located in the East Otay area of San Diego County. The intended use is for pending litigation regarding the acquisition of a temporary right of entry easement. The effective date of the appraisal is May 25, 2010.

The findings of the appraisal are presented in a self contained report. This report is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice (USPAP). As such, the report includes a description of the subject property as well as a discussion of the reasoning that has resulted in our conclusions. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The appraiser is not responsible for unauthorized use of this report.

This appraisal was performed in conformance with the Uniform Standards of Professional Appraisal Practice and the supplemental requirements of the Appraisal Institute. In addition, this appraisal was prepared and reported in conformance with the requirements of the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA, or the "Yellow Book"). The appraisal is subject to certain assumptions and limiting conditions that are made part of this report. Acceptance and use of this report by the client or any other party constitutes acceptance of these assumptions and limiting conditions. The appraisers are not responsible for unauthorized use of this report.

The value conclusion is presented on page two of this report. Thank you for this opportunity to be of service. Please contact us if you have any questions or if we may be of further service.

Sincerely,

Stephen D. Roach, MAI, SRA
AG002159

Cody F. Knox
AG044445

# TABLE OF CONTENTS

## INTRODUCTION

SUMMARY OF SALIENT FACTS AND CONCLUSIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
ASSUMPTIONS AND LIMITING CONDITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
APPRAISERS' CERTIFICATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
IDENTIFICATION OF THE PROPERTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
OWNERSHIP AND PROPERTY HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
EFFECTIVE DATE OF  APPRAISAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
PURPOSE OF THE APPRAISAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
INTENDED USE AND USERS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
PROPERTY RIGHTS APPRAISED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
DEFINITION OF PROPERTY RIGHTS APPRAISED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
SCOPE OF THE WORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
DETERMINATION OF THE LARGER PARCEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
NEIGHBORHOOD MAP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
NEIGHBORHOOD DESCRIPTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## PROPERTY DESCRIPTION

LAND DESCRIPTION - PHYSICAL CHARACTERISTICS. . . . . . . . . . . . . . . . . . . . . . . . . 22
DECLARATION OF THE TAKING MAP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
ASSESSOR'S PLAT MAP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
LAND DESCRIPTION - LEGAL CHARACTERISTICS. . . . . . . . . . . . . . . . . . . . . . . . . . . 28
OPEN SPACE/CONSERVATION EASEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
EAST OTAY MESA SPECIFIC PLAN LAND USE MAP. . . . . . . . . . . . . . . . . . . . . . . . . . 34
COUNTY ZONING MAP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
LAND DESCRIPTION - ECONOMIC CHARACTERISTICS. . . . . . . . . . . . . . . . . . . . . . . 36
IMPROVEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
DESCRIPTION OF THE ACQUISITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
RECON AERIAL PHOTO IDENTIFYING PROPERTY OWNERSHIP. . . . . . . . . . . . . . . . . 38
SUBJECT PROPERTY PHOTOGRAPHS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
LOCATION MAP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
GOOGLE EARTH AERIAL LOOKING EAST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## VALUATION

HIGHEST AND BEST USE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
METHODOLOGY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
VALUATION ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF CONTENTS
(Continued)

**ADDENDA**

Exhibit A                               Certificate of Compliance
Exhibit B                   Department of Planning and Land Use Plat
Exhibit C                               Declaration of Taking
Exhibit D                               RECON Report
Exhibit E                   Statement of Fees and Testimony List
Exhibit F                   Qualifications of the Appraisers

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| **PROPERTY OWNER:** | KYDDLF & RDLFGFT NO 1 LLC, OMC Properties LLC and International Industrial Park Inc. |
| **PROPERTY LOCATION:** | East of Alta Road, North and South of Otay Mountain Truck Trail, San Diego County. |
| **APNs:** | 648-050-17 & 20, 648-040-39, and portions of 648-040-55 & 56. |

Note: Now defunct APN 648-040-34 was planned as part of the take before the official declaration.  According to the Declaration of Taking, this parcel contained 32.0 acres, and was included in its entirety.  This parcel was replatted in 2011, and portions of the former site are now in APNs 648-040-55 and 56.  The taking has portions in both of these new parcels.

| | |
|---|---|
| **SUBJECT LAND DESCRIPTION:** | The subject consists of 242.93 acres, which consisted of the aforementioned APNs.  The parcels are in raw condition, although a portion of the subject has been graded (a portion of 648-040-56).  Much of the subject is within the East Otay Mesa Business Park Specific Plan, with a portion zoned S90. |
| **SUBJECT IMPROVEMENT DATA:** | There are no improvements on the property that have been affected by the acquisition. |
| **DESCRIPTION OF THE PART TAKEN:** | The interest acquired is a temporary right of entry easement lasting approximately one year.  The purpose of the acquisition is to allow contractors for the Department of Homeland Security to conduct surveying and testing in relation to possible future improvement of an access route from existing public streets to Otay Mountain Truck Trail. |
| **PROPERTY RIGHTS APPRAISED:** | Temporary right of entry |
| **VALUE ESTIMATED:** | Market value |
| **DATE OF VALUE:** | May 25, 2010 |

DATE OF REPORT:                    August 12, 2011

HIGHEST AND BEST USE:         Continued use as open space for the areas affected by open
                              space and conservation easements.  Mitigation land for the
                              portions of the subject with topographical issues, and possible
                              long term development potential for the gently sloping areas
                              of the subject.  Parcel 648-050-56 has been graded and has a
                              Major Use Permit for a recycling/salvage yard; the new owner
                              of this site has submitted plans for a proposed correctional
                              center.  This permit application is still pending.  The highest
                              and best use for the portion of the subject within this APN is
                              its proposed use as correctional facility (assuming approval of
                              the permit), or its permitted use as a recycling/salvage yard.

MARKET VALUE
CONCLUSION:                   It is our conclusion that the temporary non-exclusive access
                              easement has no measurable market value.

## ASSUMPTIONS AND LIMITING CONDITIONS

**This appraisal is subject to the following assumptions and limiting conditions:**

**General Assumptions and Limiting Conditions**

1.      No responsibility is assumed for the legal description or for matters including legal or title considerations.  Title to the property is assumed to be good and marketable and held in fee simple interest as of the date of valuation unless otherwise stated.

2.      Information, estimates, and opinions furnished by others and contained in this report are assumed to be true, correct, and reliable.  A reasonable effort has been made to verify such information; however, no responsibility for its accuracy is assumed by the appraisers.

3.      It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable.  No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

4.      It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

5.      It is assumed that the property is readily marketable and free of all liens and encumbrances except any specifically discussed in this report.

6.      Photographs, plats, and maps furnished in this report are to assist the reader in visualizing the property.  No survey of the property has been made, and no responsibility has been assumed in this matter.

7.      It is assumed that there are no legitimate environmental or ecological reasons that would prevent orderly development of the land to its highest and best use under economically feasible conditions, unless otherwise stated in this report.

8.      A soils engineering study has not been provided for this appraisal.  It is assumed that there are no hidden or unapparent conditions of the property such as subsoil conditions which would render it more or less valuable.  No responsibility is assumed for such conditions or for engineering which might be required to discover such factors.

9.      Possession of this report, or a copy thereof, does not carry with it the right of publication.

10.     The appraisers, by reason of this appraisal, are not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made.  The submission of this report constitutes completion of the services rendered.

## ASSUMPTIONS AND LIMITING CONDITIONS
### (Continued)

11.     Neither all, nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or the firm with which the appraisers are connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraisers.

12.     This report may not be used for any purpose by anyone other than the party to whom it is addressed without the written consent of the appraisers.

13.     The date of value to which the opinions expressed in this report apply is set forth in the letter of transmittal.  The forecasts, projections, or operating estimates contained herein are based upon current market conditions, anticipated short-term supply and demand factors, and a continued stable economy.  These forecasts are, therefore, subject to changes in the future conditions.

14.     No warranty is made as to the seismic stability of the subject property.

15.     No engineering survey has been made by the appraisers.  Except as specifically stated, data relative to size and area were taken from sources considered reliable, and no encroachment of real property improvements is assumed to exist.

16.     No opinion is expressed as to the value of subsurface oil, gas, or mineral rights and it is assumed that the property is not subject to surface entry for the exploration or removal of such materials except as is expressly stated.

17.     By acceptance and use of this report, the user agrees that any liability for errors, omissions, or judgment of the appraiser is limited to the amount of the fee charged for the appraisal.  Anyone acting in reliance upon the opinions, judgments, conclusions, or data contained herein, who has the potential for monetary loss due to the reliance thereon, is advised to secure an independent review and verification of all such conclusions and/or facts.  The user agrees to notify the appraisers, prior to any loan or irrevocable investment decision, of any error which could reasonably be determined from a thorough and knowledgeable review.

18.     Physical inspection of the property revealed no apparent contamination by hazardous chemicals or toxic wastes.  However, the appraiser is not expert in this field.  The client is urged to retain an expert, if desired.  It is assumed that no such contamination of the subject exists.

# APPRAISERS' CERTIFICATE

We certify that, to the best of our knowledge and belief:

1.      The statements of fact contained in this report are true and correct.

2.      The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased, professional analyses, opinions and conclusions.

3.      We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

4.      We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.      Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.      Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.      The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute. These include the Uniform Standards of Professional Appraisal Practice. In addition, this appraisal was prepared in conformity with the Uniform Appraisal Standards for Federal Land Acquisitions.

8.      The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10.     We have made a personal inspection of the property that is the subject of this report.

11.     No one provided significant real property appraisal assistance to the persons signing this certification.

12.     As of the date of this report, Stephen D. Roach, MAI, SRA has completed the continuing education program of the Appraisal Institute. As of the date of this report, Cody F. Knox has completed the Standards and Ethics Education Requirements of the Appraisal Institute for Associate Members. Stephen D. Roach, MAI, SRA and Cody F. Knox have each received certification from the state of California as a Certified General Real Estate Appraiser.

US v. 242.93 Acres - Temporary Right of Entry                                                    Page 6

## APPRAISERS' CERTIFICATE
(Continued)

13.     Stephen D. Roach, MAI, SRA has performed consulting services on property that included portions of the subject property in conjunction with a case titled Otay Mesa Property v. United States.


_____               _____               August 12, 2011
Stephen D. Roach, MAI, SRA              Cody F. Knox                           Date
AG002159                                AG044445

## IDENTIFICATION OF THE PROPERTY

The subject of this appraisal is 242.93 acres identified as Assessor Parcel Numbers 648-050-17 & 20, 648-040-39, and portions of 648-040-55 & 56.

## OWNERSHIP AND PROPERTY HISTORY

Based on information obtained from the RealQuest data source, as of the date of value the subject properties were vested in International Industrial Park Inc., OMC Properties LLC, and KYDDLF & RDLFGFT NO 1 LLC.  The following chart summarizes the ownership as of the date of value according to this source.

| APN | Ownership |
|---|---|
| 648-050-17 | KYDDLF & RDLFGFT NO 1 LLC |
| 648-050-20 | KYDDLF & RDLFGFT NO 1 LLC |
| 648-040-39 | OMC Properties LLC |
| 648-040-55 | International Industrial Park Inc. |
| 648-040-56 | International Industrial Park Inc. |

It is our understanding that the RealQuest information (which is supposedly obtained from county records) may be inaccurate regarding the ownership of 648-040-55 and 56.  A Certificate of Compliance recorded April 21, 2010 identifies the ownership of these properties as Rancho Vista Del Mar, another De La Fuente controlled entity.  The Certificate of Compliance has been included in the Addenda as Exhibit A; a map that was not recorded with the Certificate of Compliance but is believed to illustrate the four parcels noted on the Certificate of Compliance is included in the Addenda as Exhibit B.  Somewhat confusing the issue is that a deed for APN 648-040-56 (shown as Parcel D on the Certificate of Compliance) to CCA Western Properties (discussed ahead) indicates that the grantors are both Rancho Vista Del Mar and International Industrial Park Inc.  While it appears Rancho Vista Del Mar was the owner of 648-040-55 and 56 as of the date of value, the appraisers are unable to conclusively state ownership due to these inconsistencies.  While we reserve the right to supplement this report in the event that additional title information is provided, the ownership of all of the 242.93 acres appears to be under De La Fuente entities, and a difference in vesting for one or more of the parcels would not affect our valuation analysis or conclusions.

There have been no sales of APNs 648-050-17 and 20 in the past three years.

According to public records, APN 648-040-56 was purchased by CCA Western Properties on December 30, 2010 for $10,200,000.  Based on the size of this property shown on the assessor's plat map (36.96 acres), this indicates a price of $6.34 per square foot.  However, we were provided with a copy of an August 22, 2007 option agreement between Rancho Vista Del Mar, International Industrial Park, Inc., and CCA Western Properties.  The optionee, CCA, had the option to either purchase or lease this property; the document states that the purchase price was to have been $16.00 per square foot, subject to upward adjustment.  No further information was provided regarding this transaction.  This site has been graded and been granted a Major Use Permit (MUP) for a recycling and salvage yard.  On April 25, 2011, CCA Western Properties submitted plans for a proposed correctional center for this property.  This permit request is still pending as of the report date.

APN 648-040-39 transferred title (with no apparent consideration) on July 16, 2010 to D & D Landholdings.  It appears from public records that the owner of this property as of the date of valuation was OMC Properties LLC.

Prior to the date of value and the replatting into parcels 648-040-55 and 56, APN 648-040-34 was under the ownership of Rancho Vista Del Mar.  This property was conveyed to International Industrial Park, Inc. on February 11, 2010 for no consideration.

It is our understanding that while the properties had three different ownership entities as of the date of value, they are controlled by the same individual, Roque De La Fuente.  Mr. De La Fuente occasionally changes the names of the ownership entities, but the underlying ownership has not changed in decades.

There are several open space and conservation easements affecting the sites.  Nearly half of the subject is currently dedicated to open space.  The area unaffected by these easements is raw land.

**EFFECTIVE DATE OF APPRAISAL**

The effective date of the appraisal is May 25, 2010, the date at the Declaration of Taking was filed.  The order of possession was reportedly not effective until June 2, 2010, making the span of the right of entry from June 2, 2010 to June 1, 2011.  However, at the request of the client, we used

a date of value of May 25, 2010, indicating that the duration of the easement being considered was about one year and one week.


## PURPOSE OF THE APPRAISAL

Market value is defined in the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA) as follows:

"Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of the appraisal, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal."

This appraisal is subject to the assumptions and limiting conditions presented in this report. If it should be determined that any of these assumptions and limiting conditions are not valid, the appraisers reserve the right to amend the appraisal.  The temporary right of entry in the subject property was appraised on a cash basis.  This appraisal is subject to the assumptions and limiting conditions presented in this report.


## INTENDED USE AND USER

This appraisal is to be used by the client, the Department of Justice, and its client, the Department of Homeland Security, in conjunction with pending litigation regarding the acquisition of a temporary right of entry.  There are no other intended uses or users of the appraisal.


## PROPERTY RIGHTS APPRAISED

The property rights appraised are a right of entry lasting approximately one year.  Included in this right of entry is the right to study and test certain areas of the subject for possible road expansion to provide better access for Border Patrol vehicles between public streets and Otay Mountain Truck Trail.

## DEFINITION OF PROPERTY RIGHTS APPRAISED

The Declaration of Taking states that the purpose of the acquisition is "to conduct surveying, testing, and other investigatory work". The specific rights acquired are described on page 10, Schedule "E" as follows:

"The estate taken is a temporary, assignable easement beginning on the date possession is granted to the United States and ending 12 months later, consisting of the right of the United States, its agents, contractors, and assigns to enter in, on, over and across the land described in Schedule "C" to survey, make borings, and conduct other investigatory work for the purposes described in Schedule "B" and to access adjacent lands; including the right to trim or remove any vegetative or structural obstacles that interfere with said work; reserving to the landowners, their successors and assigns all right, title, and privileges as may be used and enjoyed without interfering with or abridging the rights hereby acquired; subject to minerals and rights appurtenant thereto, and to existing easements for public roads and highways, public utilities, railroads and pipelines."

## SCOPE OF THE WORK

This analysis is intended to be an "appraisal" as defined in the Uniform Standards of Professional Appraisal Practice (USPAP). It is our intent that the appraisal service be performed in such a manner that the results of the analysis, opinion, or conclusion be that of a disinterested third party. All appropriate data deemed pertinent to the solution of the appraisal problem was collected, confirmed, and reported in conformity with the Uniform Standards of Professional Appraisal Practice and the supplemental requirements of the Appraisal Institute. In addition, this appraisal was prepared in conformity with the Uniform Appraisal Standards for Federal Land Acquisitions. In the preparation of this appraisal, it was not necessary to invoke the Jurisdictional Exception Rule of USPAP.

In preparing this appraisal, the following tasks were performed:

• the subject property was inspected several times by the appraisers;

• the physical, legal, and economic characteristics of the subject property were investigated. Research included public records, San Diego County Assessor's records, various documents relating to notable title exceptions, and various documents relating to land use restrictions;

• we consulted and met with Mr. Paul Fromer, Mr. Charles Bull, and Mr. Lee Sherwood of RECON regarding the biological characteristics, land use restrictions, and open space agreements affecting the subject property;

- we determined the highest and best use of the property;

- we interviewed representatives of San Diego Gas & Electric Company, the County of San Diego, and other market participants regarding the compensation for temporary rights of entry;

- we interviewed several Border Patrol agents regarding their historic use of the subject property;

- research was conducted to locate, inspect, and verify contracts for temporary rights of entry;

- the impact of the temporary right of entry on possible uses of the property was analyzed;

- the impact of the temporary right of entry on the potential to sell the property was analyzed, and;

- the market value for a temporary right of entry was determined.

This self contained report includes a description of the subject property as well as the reasoning that has resulted in our opinions.  This appraisal is subject to certain assumptions and limiting conditions that are made part of this report.

## DETERMINATION OF THE LARGER PARCEL

For general valuation purposes and in order to address the issue of severance damages in the case of a partial acquisition, a determination of what constitutes the larger parcel is typically made. A "larger parcel" is a designated property from which a portion is acquired. To ascertain what constitutes a larger parcel, three basic criteria are applied. These three criteria are (1) unity of ownership, (2) physical contiguity, and (3) unity of use.

However, the concept of the larger parcel is only relevant when valuing a property. In the case of this analysis, we determined that the impact of the easement rights acquired is so minimal that it was unnecessary to value the property affected by the easement[1]. As a result, this appraisal does not value the subject property, but instead focuses on the value, if any, of the temporary right of entry that was acquired. As discussed ahead, no value is concluded for the right of entry, and the larger parcel concept is not applicable. Therefore, our analysis is limited to the 242.93 acres affected by the temporary easement.

---

[1] The Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA) states on P. 93 (Section D-10) that rights of entry are generally valued using the same methodology as temporary construction easements. UASFLA states that "Usually, the land area affected is so small and the term of the easement so short that compensation for the TCE is nominal. As a result, many agencies and appraisers have developed a *shortcut* for its estimation." UASFLA goes on to note that this shortcut of directly valuing the temporary easement is only acceptable if the compensation is nominal.

US v. 242.93 Acres - Temporary Right of Entry                                     Page 13



## NEIGHBORHOOD DESCRIPTION

The subject property is located in the region of the United States commonly known as Southern California, which is generally considered to encompass the counties of Ventura, Los Angeles, Orange, Riverside, San Bernardino, San Diego, and Imperial. This region represents the southwestern corner of the United States, as it abuts the Pacific Ocean on the west and Mexico on the south. The state of Arizona is located to the east while central California is located to the north.

More specifically, the subject property is located in the East Otay Mesa area of the County of San Diego. The original (April 1981) version of the Otay Mesa Community Plan (City of San Diego) indicates that the Otay Mesa Study Area encompasses approximately 20,600 acres, of which approximately 14,800 were in the City of San Diego and 5,800 acres were in the unincorporated area of San Diego County. The City's Otay Mesa Community Plan is a conceptual long-range policy guide for the physical development of the Otay Mesa-Brown Field area. It was intended to serve as a guide for future public and private development through the year 2000.

The Otay Mesa area is bounded by Otay River Valley and the City of Chula Vista on the north, San Ysidro Mountains on the east, the International Boundary with Mexico on the south, and by Interstate 805 to the west. The majority of Otay Mesa is comprised of generally level land. Otay Mesa, which ranges in elevation from about 450 to about 600 feet above mean sea level, is one of a series of marine wave-cut terraces characteristic of the San Diego region. The westerly two-thirds of Otay Mesa is mostly flat; the easterly one-third is characterized by low, gently rolling hills that increase in elevation gradually to the east in transition to the mountainous terrain of the San Ysidro Mountains. On the north, the moderate slopes of Otay River Valley become steep bluffs near the mesa, with several major canyons, O'Neal, Johnson, and Dennery, penetrating deeply into the mesa. To the west, the Avondale Terrace rises steeply from Interstate 805 to the mesa, with Moody Canyon and Spring Canyon comprising the major drainage systems of the area.

## Community History

The Otay Mesa area was used primarily for farming until the 1970's. With the growth of the Maquiladora or Twin Plant Program (see detailed discussion later in this report) in the early 1980's, more significant demand for industrial land was created in the United States to accommodate distribution and warehousing of products manufactured in Mexico. The opening of the Otay Mesa

Border Crossing in 1985 and improvement of Otay Mesa Road and portions of State Route 905 further enhanced development opportunities in the area.

The Otay Mesa Community Plan of the City of San Diego designates 1,855 acres for proposed residential communities in the area bordered by Interstate 805 to the west, Brown Field to the east, Otay Valley to the north, and Mexico to the south.  Most of the residentially-designated lands in western Otay Mesa are large acreage ownerships controlled by a number of developers and private investors; precise plans and tentative subdivision maps have been prepared on many of these ownerships.

San Diego County's East Otay Mesa Specific Plan sets forth a comprehensive and far-sighted vision for the development of approximately 3,013 acres as an industrial and business center.  The Specific Plan sets the framework for future development, including policies, standards, and guidelines that guide and facilitate private development.  The Specific Plan also establishes an implementation program, including infrastructure and public facility plans, and a phasing and financing strategy.  Planned land uses in the East Otay Mesa Specific Plan include 2,098.9 acres of mixed industrial, 11 acres of district commercial, 311.3 acres of low-density residential, 241 acres for conservation use, and 350.4 acres for circulation corridors.  There are 28 acres within the activity note overlay and 56 acres within the commercial center overlay.

A major land use on Otay Mesa is Brown Field.  This airport was used periodically by the U.S. Army and Navy from 1918 to 1962.  The City of San Diego took title to the airfield in 1962 and has since operated it as a public use general aviation airport.  The primary runway is approximately 8,000 feet long.  Most of the buildings on Brown Field were constructed during the 1940's and 1950's and are in poor condition.  In the early 1990's, a study was prepared for the City of San Diego on a comprehensive master plan for a "Twin-Port" with Brown Field and Aeropuerto de Tijuana.  In the end, Mexico was not interested in the concept, and the project was abandoned.  More recently, a private Mexican consortium, which was awarded the operating rights to Tijuana Airport, has proposed a $77.9 million cross-border air terminal in Otay Mesa for use of passengers utilizing Tijuana Airport.  As of January 2011, the project has a U.S. Presidential Permit and is awaiting a Mexico Presidential Permit, in addition to several other permits needed before construction can begin.  The developers reportedly plan to start construction in 2011, although this timing appears uncertain given the lack of progress to date.  Construction is expected to last about two years.  This terminal would not involve Brown Field.

East of Brown Field in the northeastern portion of Otay Mesa are Donovan State Correctional Facility and George F. Baily County Detention Facility.  Both were constructed on land sold by (or acquired from) Mr. Roque De La Fuente.  They are located west and northwest of the subject property.  These border Otay River Valley, which is being planned as a future regional park.

Another significant facility on Otay Mesa, and the driving force for its industrial development, is the second international border crossing located at the southern terminus of State Route 905, and known as the Otay Mesa Port of Entry.  Passenger cars and trucks entering the United States use this crossing; commercial trucks entering Mexico do so about one-half mile to the west via Drucker Lane south off Siempre Viva Road.  A new commercial vehicle inspection facility was built on the east side of Enrico Fermi Drive between Marconi Drive and Siempre Viva Road.  The North American Free Trade Agreement (NAFTA) has resulted in greatly increased traffic through the second border crossing and should have a positive long-term affect on industrial and support commercial development on Otay Mesa.

A new Otay Mesa East Point of Entry has been proposed and is currently in the planning stage.  This project would extend State Route 905 east past its terminus at Highway 125.  This new highway, State Route 11, would travel southeast to a point of entry south of the subject.  The project is expected to break ground in 2013 and open in 2015.  This development would likely have a positive impact on the subject's market area, increasing demand for industrial and support uses in the neighborhood.


**Population**

According to the San Diego Association of Governments (SANDAG) website, the 2010 population of the City of San Diego Otay Mesa Community Plan Area was 13,446 persons, up 2,051 persons, or approximately 18 percent, from 2005.  This area has experienced significant growth from 2001, where the population was 2,813 persons.  Projections for the Otay Mesa Community Plan area indicate a population of 37,098 persons in 10,931 dwelling units by 2020.  Population information is not available for the 3,300 acres encompassed by the East Otay Mesa Specific Plan.  The current population of this area is minimal.

**Accessibility**

State Route 905 (Otay Mesa Road) is the primary arterial serving Otay Mesa, providing a connection between Interstate 805 to the west and the second border crossing to the east. The portion of Otay Mesa Road from about one half mile east of Interstate 805 to just east of La Media Road was widened to six lanes in the late 1990's order to handle the heavy traffic flow. The road narrows to four lanes east of La Media Road. According to SANDAG, the average daily traffic volume on Otay Mesa Road was 5,500 vehicles per day at Sanyo Road in 2006, the most recent date available. Traffic is significantly heavier to the west where traffic to and from the US Point of Entry connects with Interstate 5.

The existing State Route 905 (Otay Mesa Road) was widened in the mid-1990's as a stop-gap until a 905 freeway could be constructed south and parallel to the existing State Highway. The first phase of the construction included an exchange at Siempre Viva Road completed in Spring of 2005. The next phase began in January 2008, extending the freeway from Siempre Viva Road to Brittania Boulevard. This phase was completed in November 2010. The final phase will extend the freeway to Interstate 805, which is expected to be completed in July 2012.

State Route 125 was extended by November 2007 and is an 11-mile toll road that connects the east end of State Route 905 to Otay Ranch Village and La Mesa to the north. The road was constructed initially to four lanes, but has an ultimate width potential of eight lanes plus two additional carpool lanes.

As of a decade ago, many of the surface streets on Otay Mesa were two-lane asphalt paved or decomposed granite roads. However, as new development occurred, these roads were widened and improved to City or County of San Diego Traffic Engineering Department standards per Otay Mesa Community or East Otay Mesa Specific Plan guidelines. Other than for some major circulation element roads, the construction and funding of street improvements are generally the responsibility of the subdivider or developer.

**Maquiladora Industry**

Significant economic influences in Otay Mesa include border trade, trucking and the Maquiladora industry. Manufacturing operations known as Maquiladoras are foreign-owned assembly plants in Mexico that import raw material duty-free and export final products around the world. In Otay Mesa, there are about 60 twin plants. The Maquiladoras program was established

in 1965 as part of Mexico's Border Industrialization program. The program was designed to generate employment, foreign investment, and to stimulate industry in Mexico. Maquiladoras are often referred to as "twin plants," in reference to companies that establish facilities on both sides of the border. Maquiladoras are not limited to low-tech product assembly and typically include production and assembly of automotive parts, consumer electronics, and computer parts. Under the Maquiladoras program, raw materials are temporarily (up to one year) allowed duty-free import into Mexico. Firms are required to post a bond for the value of the imports in order to assure the exportation of the goods. These materials are transformed using relatively low-cost labor and then re-exported to the U.S. or other destinations. Currently, Mexico is California's third largest export destination, and San Diego's largest export market.

**NAFTA**

A significant boost to the Maquiladora industry came in the form of the North American Free Trade Agreement (NAFTA), which was signed by the United States, Canada, and Mexico in 1994. The Agreement was designed to encourage and facilitate the trade of goods and services between the three countries. For the most part, foreign investment is largely unrestricted. However, there are a few areas of economic activity where private sector investment is not allowed and some others in which foreign participation is restricted.

**Foreign Trade Zone**

The Foreign Trade Zone (FTZ) is a federally-designated area physically located within the United States but deemed to be outside U.S. Customs territory. The FTZ in San Diego is located in the southern part of San Diego in Otay Mesa near the international border with Mexico. The are approximately 2,000 acres in Otay Mesa designated within the FTZ. However, none of the subject parcels are located in the FTZ, which extends east to the second border crossing near Enrico Fermi Drive. Most foreign-made parts, components, and merchandise may enter a zone without payment of U.S. customs duties, fees, and certain taxes. If an imported product that has been admitted to a FTZ is subsequently exported, no U.S. Customs duty is due. If, however, the product is imported into the U.S., duties, fees, and other taxes (if applicable) are due at the time the merchandise leaves the zone and enters the U.S. Customs territory. The importer may choose to pay duty at the rate applicable on either the component parts or on the finished product.

Generally, an FTZ provides importers, manufacturers, and distributors with opportunities to reduce customs duties and to defer payment until the product leaves the zone. An FTZ also offers benefits such as increased cash flow and reduced actual duty paid on imports and products warehoused, manipulated, or manufactured for export. Seventy percent of FTZ users are small businesses who can defer, reduce, or eliminate customs duties, fees, and certain taxes. Such companies include importers, manufacturers, distributors, assemblers, and exporters of imported merchandise and/or products containing imported merchandise.

**Industrial Market**

The Otay Mesa sub market is primarily industrial in character, therefore we have focused on the industrial market. Limited industrial development in Otay Mesa began as early as 1934. However, with the growth of the twin plant program in the early 1980's, a more significant demand for industrial space was created. In the mid-1980's, Otay Mesa became one of San Diego County's fastest-growing industrial markets. In 1988, the absorption of nearly 800,000 square feet of industrial space qualified Otay Mesa as San Diego County's top industrial leasing sub market. However, with the recession, leasing and land sales activity fell dramatically from about 1991 through 1995. Beginning in about 1995, the market began a modest recovery with Otay Mesa's leasing volume strengthening and finished lot prices steadily increasing. During the 2000's a large volume of new space was delivered to the market, particularly from 2002 to 2008. After this period vacancies rose dramatically and new construction halted. The following chart is generated from CoStar Properties, Inc., and summarizes market trends in the Otay Mesa sub market.



The vacancy rate experienced a decline since peaking in the fourth quarter of 2009 at 24.0 percent.  As of the second quarter of 2010, vacancies remained high, but were falling slightly, at 22.7 percent.  Inversely, market rents fell sharply from the first quarter of 2009 to the second quarter of 2010.  As of the date of value, average asking rents were $0.47 per square foot per month.  This indicates a 19.6 percent decline from the first quarter of 2009, when asking rents averaged $0.59 per square foot per month.  New construction will likely remain stalled until the existing supply is further absorbed.

**Surrounding Uses**

The Donovan State Correctional Facility and the George F. Bailey County Correctional Facility are located north and west of the subject.  The new owner of subject APN 648-040-56 (CCA) has submitted plans for a proposed correctional center, and as of the date of this report, the requested permit is still pending.  Directly south of the subject is the Otay Mesa Generating Project.  This is a natural gas fueled power station completed in 2009.  Adjacent and west of this station is a proposed Pio Pico Energy Center, which would consist of three natural gas turbine generators.

South of the power station along Access Road is a concrete mix plant under construction.  According to the county, this project had been in the planning stages since 2007.  The permits for

the development were issued on April 4, 2011.  There are seven active permits for the various buildings proposed on the site.  As of June 2011, the property is in the beginning stages of construction, with some foundation work completed.

Mr. Kelly Good with the Border Patrol indicated another proposed development in the immediate area.  On the west side of Alta Road, northwest of Calzada De La Fuente, a site has reportedly been chosen for construction of a medical prison, a facility that will detain State of California inmates with medical issues.  The prison will reportedly be constructed on land leased from a De La Fuente entity.

Further south, directly east, and north of the subject is raw land.  Various entities controlled by the De La Fuente family own roughly 2,000 acres in this area, with land further east and directly north is owned by the U.S. Government.  Northeast of the subject is the Otay Ranch Preserve, a 11,000-acre preserve set aside as mitigation land for the impacts to sensitive resources caused by development in San Diego and Chula Vista.

## Conclusions

Otay Mesa represents one of the most affordable industrial areas in the County with large tracts of available raw land.  Because of the limited infrastructure in the County portion of Otay Mesa, the vast majority of the development has occurred in the City portion of Otay Mesa where roads and utilities exist.  Although the City portion of Otay Mesa has infrastructure, continuing improvement and expansion of the existing infrastructure will need to occur.  The City portion of Otay Mesa will be likely to develop first, meaning that intensive industrial development within the County portion of Otay Mesa will be several years in the future.  In the subject's immediate area, new and proposed developments indicate the neighborhood will be desirable for heavy industrial facilities such as power plants, batch plants, recycling facilities, and other uses that the City of San Diego desires to relocate out of the city limits.

## LAND DESCRIPTION - PHYSICAL CHARACTERISTICS

The subject is identified by the plaintiff as 242.93 acres.  This area consisted of APNs 648-050-17 & 20, and 648-040-34 & 39.  However, between the planning phase and the actual acquisition, parcel 648-040-34 was replatted into 648-040-55 & 56.  The new boundaries were created by a Certificate of Compliance recorded April 21, 2010, which is included in the Addenda as Exhibit A.  The Department of Planning and Land Use plat map identifying the new parcel boundaries is included in the Addenda as Exhibit B.  The subject now contains portions of parcels 648-040-55 & 56, where it once contained parcel 648-040-34 in its entirety.

The following chart summarizes the size of the subject parcels.  The "Tract" numbers relate to the identification of the parcels in the declaration of taking.  The indicated size is taken from the declaration of taking, followed by the size as indicated by the county.

| APN | Tract Number | Size (Acres) | County Size (Acres) |
|---|---|---|---|
| 648-050-17 | 751 | 157.81 | 157.81 |
| 648-050-20 | 752 | 39.40 | 44.37 |
| 648-040-34* | 753 | 32.00 | 36.86 |
| 648-040-39 | 754 | 13.72 | 14.37 |
| | Total | 242.93 | 253.41 |
| *This parcel was replatted and this area is now in portions of 648-040-55 & 56 | | | |

For purposes of this appraisal, we have assumed that the size reported in the declaration of taking is correct.

### Location and Access

The properties are located in unincorporated San Diego County, and are situated east of the City/County boundary, east of Alta Road, and south of Otay Mountain Truck Trail.  Access to the subject is gained from Calzada De La Fuente from a gated entrance to two dirt roads that travel north to Otay Mountain Truck Trail.  Additional access may be available from Alta Road at its intersection with Otay Mountain Truck Trail, although this access is reportedly in dispute.  The issue with this access point is that Alta Road originally intersected with Otay Mountain Truck Trail, but the road

was moved further west.  In addition, there are topographic and sight line issues at the intersection of Otay Mountain Truck Trail and Alta Road.

## Street Improvements

Calzada De La Fuente is a two-lane, asphalt-paved public street.  There are asphalt curbs along portions of the street.  Calzada De La Fuente borders and provides direct access to APNs 648-040-39, 55 and 56.  Otay Mountain Truck Trail is an unimproved dirt road that travels east/west through APNs 648-050-17 and 20.

## Size and Shape

According to the United States' declaration of taking, the subject property contains 242.93 acres.  It is irregular in shape.

## Physical Condition

The subject property is mostly unimproved raw land, although the portion of the site within APN 648-040-56 has been graded.  According to our calculations using a planimeter, roughly ten acres of the subject is within this graded area.  There are a series of dirt roads on the subject property, most of which follow utility easements, access easements, and historic travel routes.  There are also power lines that travel northwest/southeast across the property.

## Topography, Drainage, and Flood Control

The subject property has generally steep and hilly topography with some gently sloping areas.  As noted, a relatively small portion of the subject property is part of a level graded pad.  Surface water generally flows south and west.

The subject is located on Flood Insurance Rate Maps, revised June 19, 1997, Community Panel No. 06073C2183 F.  The subject is located within Zone X (areas of minimal flooding).

## Soils

A soils report was not provided for this appraisal.  As such, soils conditions as to suitability for development are unknown.

**Seismic Stability**

Our research did not find any active faults at the subject site. We assume that the seismic conditions of the subject property are similar to properties in the immediate and general area of the subject, and that these conditions will not adversely impact the use of the property.

**Hazardous Waste**

Physical inspection of the subject property did not reveal the existence of any hazardous waste. However, the appraisers are not experts in this field, and not all areas of this large property were viewed. The client is urged to retain an expert, if desired. It is assumed that no such hazardous waste exists.

US v. 242.93 Acres - Temporary Right of Entry                                    Page 25

## DECLARATION OF TAKING MAP





PLAT MAP 1



## LAND DESCRIPTION - LEGAL CHARACTERISTICS

### Legal Description

A legal description of the subject was included in the Addenda as Exhibit C. As such, the larger parcels are best described as APNs 648-050-17 & 20, 648-040-39 and portions of 648-040-55 & 56.

### Easements and Encumbrances

Preliminary title reports prepared by Fidelity National Title were reviewed by the appraisers. These reports had effective dates ranging from May 3, 2011 to May 11, 2011 and related to APNs 648-050-17 & 20, 648-040-55. An additional preliminary title report prepared by Chicago Title Company dated December 7, 2009 included 648-040-39 as well as other properties. In addition to a variety of utility and access easements, there are five open space and conservation easements that affect the subject. A map displaying the orientation of these easements is included on the following page of this report.

An open space easement dated May 15, 2009 (document number 2009-0258569) encompasses much of 648-040-55. The easement is in favor of the County of San Diego, and is a perpetual easement for protection of biological resources. According to the easement, the following activities are prohibited: grading, excavation, placement of soil, sand, rock, gravel or other material, clearing of vegetation, construction, erection or placement of any building or structure, vehicular activities, trash dumping or use of any purpose other than as open space. The easement allows the county to periodically access the property to manage and monitor the property. The easement allows selective clearing of vegetation by hand as is required by written order of the fire authority to minimize fire risk. The easement also acknowledges preexisting easement holders and their right of use and access.

Another open space easement dated May 15, 2009 (document number 2009-025867) covers 648-050-20 in its entirety. Similar to the aforementioned easement, the easement is in favor of San Diego, is a perpetual easement for protection of biological resources, and carries the same restrictions and allowances.



6480110200

6480200600

6480405500

6480403100

6480404900

6480502000

6480405500

6480405600

6480404500

6480404700

6480403900

6480901700

6480501700

6480500500

6480501400

6480501300

| Open Space Easement 1 |
| Open Space Easement 2 |
| Open Space Easement 3 |
| Conservation Easement 1 |
| Conservation Easement 2 |

M:\JOBS4\6316\common_gis\working_easements.mxd   6/2/2011

Feet

A final open space easement dated October 31, 1994 (document number 1994-0633425) covers roughly one fourth of 648-050-17, located at that parcel's northwest corner.  This easement is in favor of the United States Department of the Interior, Fish and Wildlife Service.  It is a perpetual easement for open space purposes, which allows the grantee the right to remove any structures on the site and enter the site for management of the site's resources.  The easement prohibits the ownership from the following: place or maintain, or permit the erection, construction, placement or maintenance of any building or structure or other thing whatsoever, use the property for any purpose, livestock grazing or any agricultural purpose, excavation, placement of sand, soil, rock or any other material whatsoever on the premises, use of fertilizers, and defoliation of vegetation on the property except for fire prevention purposes.

There are two conservation easements we are aware of, both of which are located south of the 1994 open space easement.  According to Mr. Paul Fromer of RECON, there is no material difference between an "open space easement" and a "conservation easement".

The first is dated February 18, 1997 (document number 1997-0070643), and is in favor of The Environmental Trust, Inc., a non-profit corporation.  The easement is a perpetual conservation easement for educational, scientific, ecological, historical, recreational and scenic purposes.  The easement allows the grantee to manage the resources of the property and remove any structures on the premises.  The grantee may also construct any building that conforms to the intent of the easement.  The easement prohibits livestock on the property.

The second conservation easement is dated December 1, 1995 (document number 1995-0545089).  This easement is also in favor of The Environmental Trust, Inc., is a perpetual easement for conservation purposes, and carries the same restrictions and allowances.

According to a report prepared by RECON, the entire subject property is subject to the County of San Diego MSCP, a comprehensive habitat conservation plan.  A map identifying the MSCP designations is included in the RECON report, which has been included in the Addenda as Exhibit D.  The MSCP categories include Covered Species Take Authorization Areas, Major and Minor Amendment Areas, and Hardline Preserve Areas.  Covered Species Take Authorization Areas may typically be developed without further biological review, as these areas have already been adequately mitigated.  APNs 648-040-56 and much of 648-040-55 are within this designation.  Minor Amendment Areas are not currently part of the MSCP subarea plan.  These areas may be developed with the appropriate mitigation without hindering the goals of the MSCP.  Most of APN 648-040-39 is within this designation.  The Major Amendment Areas designation is also not a part

of the MSCP; however, these areas have a high probability of supporting habitats critical to the success of the MSCP.  Proposed developments within these areas must first amend the subarea plan, as well as comply with NEPA, U.S. Fish and Wildlife and California Department of Fish and Game regulations.  All of APN 648-050-20 and small portions of 648-040-39 are within this designation. Hardline Preserve Areas are those preserves that are publicly owned or that have been negotiated with property owners.  All of APN 648-050-17 and a portion of 648-040-55 are within this designation.

There are also a number of access and utility easements that affect the property.  An access easement dated September 17, 1985, document number 1985-352966, granted SDG&E the right to construct power lines, as well as use a 20-foot road that generally follows the power lines on the west side, although the road easement diverges from the power lines in the steeper portions of the property.  In relation to the subject, the road begins east of Calzada Del La Fuente and travels northwest before curving northeast to Otay Mountain Truck Trail.  The road appears to be several feet from the end of Calzada De La Fuente.  This connection is utilized regularly by SDG&E and the Border Patrol.

The SDG&E road is used often by the Border Patrol, Cal Fire, the San Diego County Sheriff's Department, and the public, and is reportedly one of the primary routes to be utilized by the Department of Homeland Security contractors in the right of entry that is the subject of this appraisal.  A second route often used by the above parties, and planned for use by the DHS, is a road that begins at the end of Calzada De La Fuente and travels north, east of the power lines, and intersecting with Otay Mountain Truck Trail.

Mr. Kelly Good and Mr. Jim Parker with the Border Patrol were interviewed for this appraisal.  According to Messrs. Good and Parker, the Border Patrol has used a variety of routes to access Otay Mountain Truck Trail.  For years, they reportedly accessed the truck trail directly from Alta Road.  When the road was relocated to the west and the connection blocked, they used a diagonal route from Kuebler Ranch Road off of Alta Road, northwest below the old ranch house to Otay Mountain Truck Trail.  At the request of David Wick, a representative of the subject ownership, the Border Patrol began using the aforementioned Calzada Road/SDG&E easement route exclusively by approximately July 2010.  The Border Patrol has utilized one or more of these routes daily for years.  According to Mr. Good, there are four shifts in a day, 365 days a year, during which generally 15 vehicles travel east on the roadways, and back again at the end of the shift; that equates to about

43,800 trips per year. In addition, there is at least one, and perhaps two, "scope sites" along Otay Truck Trail used by the Border Patrol for reconnaissance.

Messrs. Good and Parker noted other users of the roadways as well. Cal Fire has five emergency water tanks in the mountains to the east, and use the roadways to replenish the supply. The San Diego County Sheriff's Department accesses the area for occasional patrols. SDG&E uses both routes described, although relatively infrequently. A more prominent user of the roadways is the public. On weekends there are reportedly 20 to 25 vehicles on the roadways, including dirt bikes, cars, ATV's, 4x4's, mountain bikes and hikers. Public use is prevalent during the weekdays as well, albeit at a diminished volume.

The plat map identifies a Recreation Trail that follows along the north side of Calzada de la Fuente, and turns north along the border of APNs 648-040-55 and 56. The trail continues north to Otay Truck Trail. This trail appears to be open for public use.

### Zoning and Land Use Regulations

The subject property has multiple zoning designations, and much of it is within the East Otay Mesa Specific Plan. APNs 648-040-39, 55 & 56 and 648-050-20 are entirely within the specific plan, and roughly half of 648-050-17 is within the specific plan. The following table identifies the specific plan land use designations for each parcel.

| APN | East Otay Mesa Specific Plan Land Use Designations |
|---|---|
| 648-040-39 | Mixed Industrial (a small portion may be designated as Rural Residential) |
| 648-040-55 | Heavy Industrial and Conservation / Limited Use |
| 648-040-56 | Heavy Industrial |
| 648-050-17 | Rural Residential (southern half only, northern half is not in the specific plan) |
| 648-050-20 | Conservation / Limited Use |

Heavy Industrial allows a wide range of uses, including manufacturing, technology research centers, distribution, general industrial (processing, assembling, packaging, treatment or fabrication of materials and products), supporting commercial uses, recycling plants, salvage yards and outdoor storage. Mixed Industrial allows wholesale storage and distribution, research services, general industrial uses, and supporting commercial uses such as construction sales and automotive equipment uses. Rural Residential is a low density residential/agricultural designation.

Conservation / Limited Use is designed for areas of biological significance, and is a highly restrictive land use designation.

The portion of 648-050-17 that is not in the specific plan carries a land use designation of Estate Residential and is zoned S90 by San Diego County. This zone is for sites without adequate infrastructure, intended to limit isolated and premature developments from occurring in areas without adequate support. Allowed uses include low density residential, agricultural, and some civic uses including fire protection services. The portion of this parcel within the Specific Plan has a designation of Rural Residential. This is a very low density residential designation applied to sensitive hillside areas.

Copies of the Specific Plan land use map and San Diego County zoning map are included on the following pages.

# EAST OTAY MESA SPECIFIC PLAN LAND USE MAP



# COUNTY ZONING MAP



## LAND DESCRIPTION - ECONOMIC CHARACTERISTICS

### Assessment Information

Assessed values, base taxes, special assessments (fixed charges), and the total taxes for Assessor's Parcels 648-040-55 & 56 are unavailable, as these parcels have not yet been assessed. Tax rates will likely be similar to the surrounding properties and the former APN 648-040-34.

The subject property is located in tax rate area 084016, which carries a 2010-11 tax rate of $1.19522 per $100 of assessed valuation.  The current assessed value for the subject, including the former APN, is $937,518, and the current taxes including special assessments are $19,754.38.

The following chart summarizes the assessment information for the subject.

| APN | Land Value | Improvement Value | Taxes Including Special Assessments |
|---|---|---|---|
| 648-050-17 | $68,922 | $0 | $5,800.88 |
| 648-050-20 | $507,796 | $0 | $7,848.60 |
| 648-040-34* | $311,334 | $0 | $5,200.06 |
| 648-040-39 | $49,466 | $0 | $904.84 |
| Total | $937,518 | $0 | $19,754.38 |
| *This parcel was replatted and this area is now in portions of 648-040-55 & 56 | | | |

Under California's Proposition 13, the property would be reassessed upon a sale or other transfer of ownership.  As such, the current assessed value is not relevant to the valuation analysis.

## IMPROVEMENTS

The subject is predominantly unimproved vacant land.  There are power lines that run northwest/southeast across the property as well as several dirt roads.  There are no building improvements on the subject property.

## DESCRIPTION OF THE ACQUISITION

The acquisition was a temporary (about 12-month) right of entry easement for the purpose of "surveying, testing, and other investigatory work needed to plan the proposed construction of roads, fencing, vehicle barriers, security lighting, and related structures designed to help secure the United States/Mexico border within the State of California.[2]" The easement was non-exclusive. The Declaration of Taking is included in the Addenda as Exhibit A.

On May 25, 2010, the Department of Homeland Security filed the Declaration of Taking, however the order of possession was reportedly not in effect until June 2, 2010. For purposes of our analysis, the span of the right of entry was from May 25, 2010 to June 1, 2011.

The Department of Homeland Security has produced an account of each trip made to the property over the span of the right of entry. From June 16, 2010 to May 25, 2011, 17 trips were made to the property. Two trips were made for "field reconnaissance," six trips were made for "field review," three trips were made to "set panels for aerial mapping," one trip was made for "geotechnical investigation," one trip was made for a "site visit of proposed culvert location," and four trips were made for a "land survey." Most trips were reportedly made with one vehicle, with some trips perhaps using two.

The aerial photograph on the following page identifies the 242.93 acres with ownership and assessor's parcel numbers.

---

[2]        Declaration of Taking, page 5



M:\JOBS4\6316\common_gis\working.mxd 8/12/2011

**SUBJECT PHOTOGRAPHS**

Photos taken by Cody Knox on May 24, 2011.

View of the subject looking east along Otay Mountain Truck trail.



View of the subject looking north.



View of the subject looking south.



US v. 242.93 Acres - Temporary Right of Entry                                    Page 40





GOOGLE EARTH AERIAL LOOKING EAST

## HIGHEST AND BEST USE

Highest and best use is an important concept in real estate valuation as it represents the premise upon which value is based.  As used in this report, highest and best use is defined on page 277 of *The Appraisal of Real Estate, 13th Edition* (2008) as follows:

"The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value."

This definition applies to vacant land or improved property.  The highest and best use of vacant land could be immediate development of the property or holding for future development.  The determination of the highest and best use of a site, either improved or vacant, must consider four criteria.  These criteria are that the highest and best use must be (1) physically possible, (2) legally permissible, (3) financially feasible, and (4) maximally productive.  These criteria are often considered in that order because qualification under the latter tests does not matter if the property fails the earlier tests.

The highest and best use of a property is determined by social, economic, governmental, and environmental forces.  The relative weight that any of these forces carries in determining the highest and best use of a property depends on the individual property.  Social forces are exerted primarily by population characteristics.  Specifically, the demographic composition of the population reveals the potential demand for real estate.  Examples of social forces that influence real estate are population changes, rate of family formations and dissolutions, and age distributions.

Economic forces determine the supply and demand conditions influencing real estate.  The desire and ability of the population to satisfy its demand for real estate, or those uses situated on the real estate, are determined by economic forces.  Examples of economic forces influencing the demand for real estate are employment and wage levels, the economic base of the region and community, price levels, and the cost and availability of mortgage credit.  Examples of economic forces influencing the supply of real estate are the stock of available improved properties, proposed development, occupancy rates, and price patterns of existing properties.

Governmental influences include a broad range of political and legal actions which influence the provision of public services, restrict the supply of real estate through zoning and planning ordinances, establish local, state, and national fiscal policies, and special legislation (e.g., a building moratorium) which may influence property values and availability.

Environmental conditions which may influence real estate include climatic conditions, topography and soil, transportation systems, and the nature and desirability of the immediate neighborhood surrounding a property.  Environmental forces can be external to the property being appraised or can include characteristics of the property itself.  While the four forces that influence value have been identified separately, they work in concert to affect property values.  For a given property these forces will probably exert uneven influence on the value, with certain forces having greater impact on that property than others.

Much of the subject has rolling topography and is ill-suited for development, including all of parcels 648-020-17 and 20.  The portion of the site that has been graded for use as a recycling and salvage yard (a portion of 648-040-56) is physically suited for a variety of uses.  The portion of the subject that covers 648-040-39 and 648-040-55 has gently sloping to hilly topography ranging in elevation from roughly 680 to 760 feet above sea level.  This area is also considered physically suitable for a range of uses, although grading work would be necessary.

The property has a variety of zoning designations, mostly within the East Otay Mesa Specific Plan.  The area outside the specific plan is zoned S90, Holding Area.  This zone allows low density residential, agricultural and a relatively narrow range of commercial development.  Within the specific plan, the subject has a range of land use classifications including Mixed Industrial, Heavy Industrial, Conservation/Limited Use and Rural Residential.  The industrial designations allow manufacturing, office, storage and distribution, and other general industrial uses.  The Heavy Industrial zone allows these uses as well as salvage yards and recycling plants.

Much of the subject is encumbered by open space and conservation easements, which severely limit the legal uses.  To the best of our knowledge, all of parcels 648-040-39 and 648-040-56 are unaffected by these easements.  648-040-39 is zoned Mixed Industrial and 648-040-56 is zoned Heavy Industrial.  A portion of 648-050-17 is unaffected by the easements, and this site is zoned S90 and Rural Residential.  Both of these designations allow low density residential development.  However, areas of the subject outside the open space and conservation easements are impacted by the MSCP.  All of 648-050-17 has been designated as hardline preserve, which, combined with the locational and topographic influences, will likely limit this area to mitigation uses only.

Regarding financial feasibility, the area outside the open space and conservation easements on parcel 648-050-17 would likely not experience any development in the short term due to the lack

of infrastructure and topographical issues. This is true for 648-040-39 as well, although its superior zoning and closer proximity to infrastructure make development on this parcel more likely.

The graded area on 648-040-56 is located along a public street, and is most suitable for development. However, current economic conditions are relatively weak and demand for many types of new development in the subject's area is limited. This site has an active major use permit for a recycling and salvage yard. This use is considered a highly profitable potential use of the site. As previously discussed, the property was purchased by CCA Western Properties on December 30, 2010. Four months later on April 25, 2011, the ownership submitted plans for a permit to construct a correctional center. This request is still pending. This appears to be a profitable use for the site, and there are similar facilities in the area.

One possible use of the subject property is as a parachute drop zone, as there are several parcels (albeit small) devoted to this use in the general Otay Mesa area. There are several operating commercial parachute companies in the general area that rent nearby land for drop zones. The leases include the right to enter the property and retrieve personnel and equipment from the rented land. We interviewed Mr. Andy Powell with Pacific Coast Skydiving, who indicated that his company specializes in tandem jumps (not accelerated free-fall). He has performed over 12,000 jumps and his employees likewise have a high level of experience. Due to these factors, Mr. Powell requires only a small area of land on which to operate. The company reportedly rents a roughly 100 foot by 200 foot parcel of land located south of the Otay Mesa Generating Plant and southwest of the proposed concrete plant. Mr. Powell indicated that his operation will be displaced when the new border crossing is constructed, but that he has already obtained a commitment for an alternate site, located northwest of the current location near the intersection of Otay Mesa Road and Alta Road. Mr. Powell noted that the subject is not a suitable site for a drop zone, as the proper location for such an operation must be flat and located away from power lines and other obstructions.

Skydive San Diego is a similar company that operates from the Otay Lakes area, north of the subject. Owner Mr. Buzz Fink noted that there is absolutely no way the subject site would be an acceptable location for his operation due to the topography and the proximity to power lines and other obstructions.

Another possible use for the subject property is as grazing land for livestock. However, the numerous open space and conservation easements encumbering the property prohibit this use in these portions of the site. The portions of the site that are not subject to the easements are generally too steep for this use.

**Conclusion of Highest and Best Use**

The portions of the subject property that are subject to open space and conservation easements have a highest and best use to hold as open space/mitigation, because these areas have been limited by easement agreements to this use.  The areas in APN 648-050-17 unaffected by open space/conservation easements have a highest and best use of mitigation.  APN 648-040-39, which is also unaffected by open space/conservation easements, has a highest and best use of speculation or mitigation land.  The owner of APN 648-040-56 is currently in the process of obtaining a permit for a proposed correctional center.  This is considered to be a valuable use of the property.  Were this permit denied, the property is believed to have an active MUP for use as a recycling/salvage yard, which is also considered a highly profitable use of the site.

Accordingly, the subject has a range of highest and best uses.  The following analysis considers the potential impact of the subject right of entry easement on these uses.

**METHODOLOGY**

The purpose of this appraisal is to estimate the market value, if any, of a temporary right of entry easement. The acquisition is a temporary easement with a time span of May 25, 2010 to June 1, 2011. The intention of the easement was for surveying and testing for possible future roadway improvements from Calzada De La Fuente to Otay Truck Trail. Over the roughly 12-month period, the Department of Homeland Security's contractors reportedly made two trips for field reconnaissance, six trips for field review, three trips to set panels for aerial mapping, for geotechnical investigation, for a site visit of proposed culvert location, and four trips for a land survey. Most trips were reportedly made with one vehicle, with some trips perhaps using two.

As noted, we determined that the impact of the easement rights acquired is so minimal that it was not necessary to value the property affected by the easement. As a result, this appraisal does not value the subject property, but instead analyzes the value, if any, of the temporary right of entry that was acquired. As such, our analysis is limited to the 242.93 acres affected by the temporary easement[3]. The methodology was to research evidence that would indicate a demonstrable market or value for similar rights of entry. We interviewed market participants who often acquire temporary rights of entry, we reviewed right of entry easements, we analyzed the impact of the easement on the highest and best use of the property, and we analyzed the impact of the easement on a possible sale of the property.

---

[3]     As noted, UASFLA permits such a scope of work under certain circumstances. We believe that the subject case meets the criteria set forth in these standards.

## VALUATION ANALYSIS

The right of entry easement that is the subject of this appraisal is intended for inspection and survey purposes. This is a very common occurrence in real estate. For example, one would not consider purchasing a home without a personal inspection, and further inspections by professionals would be assumed part of the process. In commercial real estate, this process is more complicated, and there is an understanding in the marketplace that extensive due diligence periods (with multiple inspections) take place.

### Rights of Entry

As part of a due diligence period, buyers in the market will inspect prospective purchases and even perform testing much as the Department of Homeland Security intended with the subject right of entry. However, we were unable to locate an instance where any buyer actually purchased a right of entry as part of the sale. While it is common for funds to be placed in escrow prior to the due diligence period, this money is essentially always refundable.

Marketplace participants noted that rights of entry are highly common in the area, and this is consistent with our experience over many years. Mr. Ron Bamberger of Boardwalk Development is a San Diego County commercial real estate developer who noted that he always inspects properties he is interested in purchasing, sometimes on multiple occasions. Many times these inspections do not result in him pursuing a purchase, yet he has never once paid for a right of entry for inspection and survey purposes. According to Mr. Bamberger, this is simply an accepted practice in the market.

Mr. Quentin Arvin is a real estate appraiser with San Diego County. He has been involved in many transactions where the County acquired or sold property. Mr. Arvin noted that the county is currently considering the purchase of a site that is not under the threat of condemnation. The county has been given a 120 day "free look" to understand the property and perform inspections. Mr. Arvin added that this is common when buying or selling, and in his 20 years at the county, never once has he seen the county pay for a right of entry, nor have they required payment for one. This includes longer term periods for rights of entry, as much as one and two years in duration, for projects with multiple phases.

San Diego Gas and Electric Company (SDG&E) often receives right of entry agreements to conduct testing and inspections in conjunction with proposed projects. According to Mr. Jeff Sykes with the Land Services department, most of these rights of entry are granted for free and without

protest.  However, it should be understood that SDG&E has the right to condemn these rights if necessary,  and that California law provides for pre-condemnation rights of entry by entities having the power to condemn property.

**Nearby Rights of Entry**

We have reviewed 46 right of entry easements in the immediate area, all of which are silent as to compensation.  According to Mr. Kelly Good with the US Border Patrol, these easements were granted without payment.  These rights of entry relate to ongoing efforts to secure the US/Mexico border, and several are in conjunction with the Secure Fence Act of 2006.  The easements allow several agencies including the US Border Patrol, the Department of Homeland Security, and the County of San Diego, to enter an array of properties to survey, maintain roadways, and construct a border fence.  The easements have a range of dates, with two from 1998, one from 2002, three from 2006, 20 from 2007, 10 from 2008, six from 2010 and four from 2011.  Regarding duration, two have a three-month time frame, five are six months, 28 are 12 months, 10 are 24 months, and one states its duration as "indefinite".  Four of the easements require the grantee to give notice before entering the property; the remaining 42 do not contain such a provision.

**Potential Interference With Property Uses**

We analyzed the subject easement to determine whether it would preclude or interfere with potential uses of the subject property.  The open space and conservation easements covering much of the subject property highly constrain possible uses.  Roughly half the subject is reserved as open space, essentially eliminating any possibility of development or active use of this portion of the property.  The reasonable access routes that could be used to travel from the east end of Calzada de la Fuente to Otay Truck Trail generally traverse areas encumbered by these easements.  As noted, the conservation and open space easements recognize the existence of human activity due to the historic use of this corridor for access and utilities.  Our conversations with Mr. Fromer indicate that the temporary access easement would not affect the use of the portion of the property restricted by easement to open space/conservation.

Much of the remaining area is severely restricted by zoning and the MSCP designation of hardline preserve.  The areas of the property that are so designated were concluded to have a highest and best use of mitigation.  Mr. Fromer indicated that the temporary easement would not affect this use of the property.

The portion of the subject property within the graded pad (a portion of APN 648-040-56) had a highest and best use for a detention facility, or use in compliance with the MUP for recycling/salvage yard. The detention facility use was in the early planning stage and could not have been affected by the temporary easement. We have concluded that the non-exclusive easement similarly would not have affected any other near-term potential use of this portion of the property.

In summary, it is our conclusion that the temporary non-exclusive easement that was acquired would not have any impact on the existing or possible passive uses of the property, nor on any potential active uses available for the property.

**Potential Interference With Sale**

We also analyzed the subject easement to determine whether its existence would interfere with a possible sale of the property. Regarding the areas of the subject with sensitive habitats and topography issues, and are available for use as mitigation land, a report by RECON addressed the impact of the subject easement on these areas. The study concluded that "the habitat functions and values of the area would not be impaired or compromised by the temporary entry access." The study cited the existing roadways, the regular use of those roadways by others, and the minimal impact the subject easement would have on the operation and condition of the property. We have concluded that the areas of the property having a highest and best use for mitigation were still available for this use during the pendency of the easement, and that the areas subject to the open space and conservation easements were in no way impaired by the easement.

The 242.93 acres does include an area that has been graded, is not affected by open space easements or restrictive zoning, and is not biologically significant. This area is the portion of the subject within APN 648-040-56. As previously discussed, this property was purchased by CCA Properties on December 30, 2010, in the middle of the access easement time frame. We contacted Mr. Brian Wiggins of CCA Western Properties for information on the sale, but Mr. Wiggins declined to comment on the transaction in any way. However, based on public records, the property did sell, and it is apparent that the subject easement did not stop the sale from occurring.

**Conclusion**

Our research has indicated that rights of entry such as the subject are typically granted without payment. Considering the existing Border Patrol, SDG&E, and public use on the subject

property, which is far more frequent and invasive, we have concluded that the subject right of entry does not measurably affect the value or use of the subject property.  Further, a portion of the 242.93 acres was actually sold during the course of the right of entry, which is further indication that the right of entry did not affect the property.  We are unable to find any evidence that the subject right of entry would have a measurable impact on the subject's value.

In summary, the easement acquired does not change the uses for which the property is legally available, has no impact on any potential physically possible use of the property, and does not impair the use or sale of the property for any of the available uses.  Further, we conclude there is no demonstrable market for similar rights of entry.  Therefore, we determined that the subject right of entry easement has no measurable market value.

DOC # 2010-0198134



RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

COUNTY OF SAN DIEGO
Department of Planning and Land Use
Attn: ZONING COUNTER
5201 Ruffin Road
San Diego, CA 92123-1666

Mail Station 0650·     **8833**

APR 21, 2010    2:11 PM

OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:         37.00

**PAGES:    10**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CERTIFICATE OF COMPLIANCE
### (Section 66499.35 of the Government Code)
### (BEING RECORDED TO CORRECT A PREVIOUS CERTIFICATE OF COMPLIANCE RECORDED AS DOCUMENT NUMBER: 2010-0187060)

The Director of Planning and Land Use has determined that the four parcels of real property described below have been divided or have resulted from a division in compliance with the Subdivision Map Act and with provisions of the San Diego County Code adopted pursuant hereto.

Owner:    PARCEL A:        INTERNATIONAL INDUSTRIAL PARK, INC. A CALIFORNIA
                           CORPORATION

          PARCELS B, C & D:    RANCHO VISTA DEL MAR, A CALIFORNIA CORPORATION

Description:  See Exhibit "A", attached.

NOTE:  The descriptions in Exhibit "A", have been provided by the owner of the property and neither the County of San Diego nor any of its officers or employees assume responsibility for the accuracy of said descriptions.

This Certificate of Compliance shall in no way affect the requirements of any other County, State, Federal, or local agency that regulates development of real property.

Date:  April 21, 2010            DEPT. OF PLANNING AND LAND USE
                                 ERIC GIBSON, DIRECTOR

DPL Case No.:  C09-0035(BA)1

Assessor's Parcel No.:  648-040-15, 17, 28, 31, & 34

BY:     *Bian R Baca*

                    Brian Baca, Chief

DPLU# 344 (Rev. 9/20/99)

8834

## EXHIBIT 'A'
## PARCEL "A" (B/C09-0035)

PARCEL 'A':

BEING THOSE PORTIONS OF THE NORTHEAST QUARTER AND THE NORTHWEST QUARTER OF SECTION 30, TOWNSHIP 18 SOUTH, RANGE 1 EAST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH QUARTER CORNER OF SAID SECTION 30, SAID POINT BEING ALSO A FOUND "S.D. CO. ENG." TAG ON THE NORTHEAST EDGE OF A 5.00 FOOT DIAMETER CONCRETE VAULT, THE SOUTH QUARTER CORNER THEREOF BEING MARKED WITH A 3-1/2" BRASS DISC IN A WELL MONUMENT, BEARS SOUTH 00°54'46" WEST 5373.86 FEET THEREFROM; THENCE ALONG THE NORTH LINE OF SAID SECTION 30, SOUTH 89°50'18" EAST 967.57 FEET; THENCE LEAVING SAID NORTH LINE SOUTH 01°10'04" WEST 462.72 FEET; THENCE NORTH 89°05'13" WEST 165.95 FEET; THENCE SOUTH 41°55'39" WEST 182.36 FEET; THENCE SOUTH 0°00'00" EAST 125.83 FEET; THENCE SOUTH 87°57'18" EAST 170.94 FEET; THENCE NORTH 85°09'28" EAST 474.87 FEET; THENCE SOUTH 01°11'38" WEST 732.87 FEET; THENCE NORTH 89°19'18" WEST 265.35 FEET TO THE BEGINNING OF A NON-TANGENT 60.00 FOOT RADIUS CURVE CONCAVE NORTHEASTERLY, A RADIAL TO WHICH BEARS SOUTH 00°40'45" WEST; THENCE WESTERLY AND NORTHWESTERLY ALONG SAID CURVE A DISTANCE OF 28.21 FEET THROUGH A CENTRAL ANGLE OF 26°56'19" TO THE

8835

BEGINNING OF A 90.00 FOOT RADIUS REVERSE CURVE CONCAVE SOUTHWESTERLY; THENCE NORTHWESTERLY AND WESTERLY ALONG SAID CURVE A DISTANCE OF 41.95 FEET THROUGH A CENTRAL ANGLE OF 26°42'18"; THENCE NORTH 89°05'15" WEST 916.59 FEET TO THE BEGINNING OF A 30.00 FOOT RADIUS CURVE CONCAVE SOUTHEASTERLY; THENCE WESTERLY, SOUTHWESTERLY AND SOUTHERLY ALONG SAID CURVE A DISTANCE OF 47.12 FEET THROUGH A CENTRAL ANGLE OF 90°00'00' TO A POINT OF TANGENCY ON THE EASTERLY LINE OF ALTA ROAD AS DESCRIBED IN EASEMENT TO THE COUNTY OF SAN DIEGO RECORDED FEBRUARY 17, 2009 AS INSTRUMENT NO. 2009-0074847, OFFICIAL RECORDS, SAID COUNTY; THENCE ALONG SAID EASTERLY LINE SOUTH 00°54'46" WEST 1204.34 FEET TO THE BEGINNING OF A TANGENT 30.00 FOOT RADIUS CURVE CONCAVE NORTHEASTERLY; THENCE SOUTHERLY AND SOUTHEASTERLY ALONG SAID CURVE A DISTANCE OF 47.35 FEET THROUGH A CENTRAL ANGLE OF 90°26'27" TO THE NORTHERLY LINE OF ENERGY CENTER WAY (CALZADA DE LA FUENTE) AS DESCRIBED IN EASEMENT TO THE COUNTY OF SAN DIEGO RECORDED AUGUST 6, 2002 AS INSTRUMENT NO. 2002-0661040, OFFICIAL, RECORDS, SAID COUNTY; THENCE ALONG SAID NORTHERLY LINE SOUTH 89°31'42" EAST 1243.31 FEET; THENCE LEAVING SAID NORTHERLY LINE SOUTH 01°11'38" WEST 36.00 FEET TO THE EAST-WEST CENTER SECTION LINE OF SECTION 30, BEING ALSO THE CENTERLINE OF SAID ENERGY CENTER WAY; THENCE ALONG SAID EAST-WEST CENTER SECTION LINE NORTH 89°31'42" WEST 1315.37 FEET TO THE CENTER OF SECTION 30, BEING ALSO THE CENTERLINE INTERSECTION OF SAID ALTA ROAD AND SAID ENERGY CENTER WAY; THENCE ALONG THE

8836

CENTERLINE OF ALTA ROAD AND THE NORTH-SOUTH CENTER SECTION LINE OF SECTION 30 NORTH 00°54'46" EAST 336.01 FEET; THENCE LEAVING SAID NORTH-SOUTH CENTER SECTION LINE NORTH 89°34'38" WEST 686.53 FEET TO THE EASTERLY LINE OF PARCEL 1 PER DEED TO THE STATE OF CALIFORNIA, RECORDED MARCH 25, 1983 AS INSTRUMENT NO. 83-095943, OFFICIAL RECORDS, SAID COUNTY; THENCE ALONG SAID EASTERLY LINE NORTH 00°30'38" EAST 670.81 FEET TO THE SOUTHERLY LINE OF THE NORTH QUARTER OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 30; THENCE LEAVING SAID EASTERLY LINE ALONG SAID SOUTHERLY LINE SOUTH 89°40'30" EAST 691.25 FEET TO THE SAID NORTH-SOUTH CENTER SECTION LINE AND THE CENTERLINE OF SAID ALTA ROAD; THENCE ALONG SAID NORTH-SOUTH CENTER SECTION LINE NORTH 00°54'46" EAST 386.48 FEET TO AN ANGLE POINT ON THE EASTERLY LINE OF SAID PARCEL 1 TO THE STATE OF CALIFORNIA; THENCE ALONG SAID EASTERLY LINE NORTH 89°44'01" WEST 694.03 FEET; THENCE NORTH 00°30'42" EAST 1291.23 FEET TO THE NORTHERLY LINE OF SAID SECTION 30; THENCE ALONG SAID NORTHERLY LINE SOUTH 89°55'04" EAST 703.10 FEET TO THE SAID NORTH QUARTER CORNER OF SAID SECTION 30 AND THE **POINT OF BEGINNING.**

CONTAINING 68.874 ACRES / 3,000,151 SQ. FT. MORE OR LESS.



8837

**EXHIBIT 'A'**
**PARCEL "B" (B/C09-0035)**

PARCEL 'B':

BEING THOSE PORTIONS OF THE NORTHEAST QUARTER OF SECTION 30, AND THE NORTHWEST QUARTER OF SECTION 29, TOWNSHIP 18 SOUTH, RANGE 1 EAST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH QUARTER CORNER OF SAID SECTION 30, SAID POINT BEING ALSO A FOUND "S.D. CO. ENG." TAG ON THE NORTHEAST EDGE OF A 5.00 FOOT DIAMETER CONCRETE VAULT, THE NORTHEAST CORNER OF SAID SECTION 30, BEING MARKED WITH A 2" DIAMETER IRON PIPE MARKED "L.S. 4620", BEARS SOUTH 89°50'18 EAST 2684.96 FEET THEREFROM, (RECORD SOUTH 89°50'05" EAST 2685.29 FEET PER RECORD OF SURVEY NO. 16946 RECORDED APRIL 13, 2001 AS FILE NO. 2001-0228252, OFFICIAL RECORDS, SAID COUNTY); THENCE ALONG THE NORTH LINE OF SAID SECTION 30, SOUTH 89°50'18" EAST 967.57 FEET TO THE TRUE POINT OF BEGINNING; THENCE LEAVING SAID NORTH LINE SOUTH 01°10'04" WEST 462.72 FEET; THENCE NORTH 89°05'13" WEST 165.95 FEET; THENCE SOUTH 41°55'39" WEST 182.36 FEET; THENCE SOUTH 0°00'00" EAST 125.83 FEET; THENCE SOUTH 87°57'18" EAST 170.94 FEET; THENCE NORTH 85°09'28" EAST 474.87 FEET; THENCE SOUTH 01°11'38" WEST 732.87 FEET; THENCE NORTH 89°19'18" WEST 56.61 FEET; THENCE SOUTH 00°05'22" EAST 69.11 FEET, THENCE SOUTH 25°53'13" EAST 138.11 FEET;

8838

THENCE SOUTH 26°34'37" EAST 136.10 FEET; THENCE SOUTH 38°56'30" EAST 145.31 FEET, THENCE SOUTH 59°02'57" EAST 152.13 FEET; THENCE SOUTH 50°01'38" EAST 351.85 FEET, THENCE SOUTH 57°32'31" EAST 113.39 FEET; THENCE SOUTH 29°45'27" EAST 140.20 FEET; THENCE SOUTH 31°50'26" EAST 148.39 FEET, THENCE SOUTH 22°15'35" EAST 170.99 FEET; THENCE SOUTH 00°28'14" WEST 48.35 FEET TO THE NORTHERLY LINE OF ENERGY CENTER WAY (CALZADA DE LA FUENTE) AS DESCRIBED IN EASEMENT TO THE COUNTY OF SAN DIEGO RECORDED AUGUST 6, 2002 AS INSTRUMENT NO. 2002-0661038, OFFICIAL RECORDS, SAID COUNTY; THENCE ALONG SAID NORTHERLY LINE NORTH 89°31'42" WEST 889.91 FEET; THENCE LEAVING SAID NORTHERLY LINE SOUTH 01°11'38" WEST 36.00 FEET TO THE EAST-WEST CENTER SECTION LINE OF SAID SECTION 30, BEING ALSO THE CENTERLINE OF SAID ENERGY CENTER WAY; THENCE ALONG SAID EAST-WEST CENTER SECTION LINE SOUTH 89°31'42" EAST 1337.31 FEET TO THE EAST QUARTER CORNER OF SECTION 30; THENCE ALONG THE EAST-WEST CENTER SECTION LINE OF SAID SECTION 29 NORTH 89°40'53" EAST 629.46 FEET TO THE WESTERLY LINE OF PARCEL B PER CERTIFICATE OF COMPLIANCE RECORDED MARCH 15, 2002 AS INSTRUMENT NO. 2002-0219163, OFFICIAL RECORDS, SAID COUNTY; THENCE LEAVING SAID EAST-WEST CENTER SECTION LINE OF SAID SECTION 29, ALONG SAID WESTERLY LINE OF PARCEL B THE FOLLOWING FIVE COURSES: NORTH 40°17'41" WEST 984.96 FEET; THENCE NORTH 64°23'56" WEST 1227.91 FEET; THENCE NORTH 01°01'12" EAST 700.08 FEET; THENCE NORTH 38°05'38" EAST 532.49 FEET; THENCE NORTH 01°01'12" EAST 300.03 FEET TO THE NORTHERLY LINE OF SAID SECTION 30 DISTANT THEREON NORTH 89°50'18" WEST 843.75 FEET

8839

FROM THE SAID NORTHEAST CORNER THEREOF; THENCE ALONG SAID NORTHERLY LINE NORTH 89°50'18" WEST 873.64 FEET TO THE **TRUE POINT OF BEGINNING.**

CONTAINING 42.835 ACRES / 1,865,901 SQ. FT. MORE OR LESS



**8840**

EXHIBIT "A"
PARCEL "C" (B/C09-0035)

**PARCEL C:**

BEING THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 18 SOUTH,
RANGE 1 EAST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SAN DIEGO,
STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH QUARTER CORNER OF SAID SECTION 30, SAID POINT BEING
ALSO A FOUND "S.D. CO. ENG." TAG ON THE NORTHEAST EDGE OF A 5.00 FOOT DIAMETER
CONCRETE VAULT, THE SOUTH QUARTER CORNER THEREOF BEING MARKED WITH A 3-1/2"
BRASS DISC IN A WELL MONUMENT, BEARS SOUTH 00°54'46" WEST 5373.86 FEET
THEREFROM; THENCE ALONG THE NORTH-SOUTH CENTER SECTION LINE OF SAID SECTION
30 SOUTH 00°54'46" WEST 2688.06 FEET TO THE CENTER OF SECTION 30, BEING ALSO THE
CENTERLINE INTERSECTION OF ALTA ROAD AND ENERGY CENTER WAY (CALZADA DE LA
FUENTE); THENCE ALONG THE EAST-WEST CENTER SECTION LINE OF SAID SECTION 30,
BEING ALSO THE CENTERLINE OF SAID ENERGY CENTER WAY, SOUTH 89°31'42" EAST 452.46
FEET; THENCE LEAVING SAID CENTERLINE NORTH 00°28'18" EAST 36.00 FEET TO THE
NORTHERLY LINE OF SAID ENERGY CENTER WAY AS DESCRIBED IN EASEMENT TO THE
COUNTY OF SAN DIEGO RECORDED AUGUST 6, 2002 AS INSTRUMENT NO. 2002-0661040,
OFFICIAL RECORDS, SAID COUNTY, AND THE **TRUE POINT OF BEGINNING.** THENCE
LEAVING SAID NORTHERLY LINE NORTH 00°54'45" EAST 1261.42 FEET; THENCE NORTH
89°05'15" WEST 380.17 FEET TO THE BEGINNING OF A TANGENT 30.00 FOOT RADIUS CURVE
CONCAVE SOUTHEASTERLY; THENCE WESTERLY AND SOUTHWESTERLY ALONG SAID
CURVE A DISTANCE OF 47.12 FEET THROUGH A CENTRAL ANGLE OF 90°00'00" TO A POINT
OF TANGENCY ON THE EASTERLY LINE OF ALTA ROAD AS DESCRIBED IN EASEMENT TO
THE COUNTY OF SAN DIEGO RECORDED FEBRUARY 17, 2009 AS INSTRUMENT NO. 2009-
0074847, OFFICIAL RECORDS, SAID COUNTY; THENCE ALONG SAID EASTERLY LINE SOUTH
00°54'46" WEST 1204.34 FEET TO THE BEGINNING OF A TANGENT 30.00 FOOT RADIUS CURVE
CONCAVE NORTHEASTERLY; THENCE SOUTHERLY AND SOUTHEASTERLY ALONG SAID
CURVE A DISTANCE OF 47.35 FEET THROUGH A CENTRAL ANGLE OF 90°26'27" TO THE
NORTHERLY LINE OF SAID ENERGY CENTER WAY; THENCE ALONG SAID NORTHERLY LINE
SOUTH 89°31'42" EAST 379.95 FEET TO THE **TRUE POINT OF BEGINNING.**

CONTAINING 11.884 ACRES / 517,658 SQ. FT. MORE OR LESS

8841

EXHIBIT "A"

PARCEL "D" (B/C09-0035)

## PARCEL D:

BEING THAT PORTION OF THE NORTHEAST QUARTER OF SECTION 30, TOWNSHIP 18 SOUTH, RANGE 1 EAST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH QUARTER CORNER OF SAID SECTION 30, SAID POINT BEING ALSO A FOUND "S.D. CO. ENG." TAG ON THE NORTHEAST EDGE OF A 5.00 FOOT DIAMETER CONCRETE VAULT THE SOUTH QUARTER CORNER THEREOF BEING MARKED WITH A 3-1/2" BRASS DISC IN A WELL MONUMENT, BEARS SOUTH 00°54'46" WEST 5373.86 FEET THEREFROM; THENCE ALONG THE NORTH-SOUTH CENTER SECTION LINE OF SAID SECTION 30 SOUTH 00°54'46" WEST 2688.06 FEET TO THE CENTER OF SECTION 30, BEING ALSO THE CENTERLINE INTERSECTION OF ALTA ROAD AND ENERGY CENTER WAY (CALZADA DE LA FUENTE); THENCE ALONG THE EAST-WEST CENTER SECTION LINE OF SAID SECTION 30, BEING ALSO THE CENTERLINE OF SAID ENERGY CENTER WAY, SOUTH 89°31'42" EAST 452.46 FEET; THENCE LEAVING SAID CENTERLINE NORTH 00°28'18" EAST 36.00 FEET TO THE NORTHERLY LINE OF SAID ENERGY CENTER WAY AS DESCRIBED IN EASEMENT TO THE COUNTY OF SAN DIEGO RECORDED AUGUST 6, 2002 AS INSTRUMENT NO. 2002-0661040, OFFICIAL RECORDS, SAID COUNTY, AND THE TRUE POINT OF BEGINNING; THENCE LEAVING SAID NORTHERLY LINE NORTH 00°54'45" EAST 1261.42 FEET; THENCE SOUTH 89°05'15" EAST 536.42 FEET TO THE BEGINNING OF A TANGENT 90.00 FOOT RADIUS CURVE CONCAVE TO THE SOUTHWEST; THENCE EASTERLY AND SOUTHEASTERLY ALONG SAID CURVE A DISTANCE OF 41.95 FEET THROUGH A CENTRAL ANGLE OF 26°42'18" TO THE BEGINNING OF A 60.00 FOOT RADIUS REVERSE CURVE CONCAVE NORTHEASTERLY; THENCE SOUTHEASTERLY AND EASTERLY ALONG SAID CURVE A DISTANCE OF 28.21 FEET THROUGH A CENTRAL ANGLE OF 26°56'19"; THENCE NON-TANGENT TO SAID CURVE SOUTH 89°19'18" EAST 208.74 FEET; THENCE SOUTH 00°05'22" EAST 69.11 FEET; THENCE SOUTH 25°53'13" EAST 138.11 FEET; THENCE SOUTH 26°34'37" EAST 136.10 FEET; THENCE SOUTH 38°56'30" EAST 145.31 FEET; THENCE SOUTH 59°02'57" EAST 152.13 FEET; THENCE SOUTH 50°01'38" EAST 351.85 FEET; THENCE SOUTH 57°32'31" EAST 113.39 FEET; THENCE SOUTH 29°45'27" EAST 140.20 FEET; THENCE SOUTH 31°50'26" EAST 148.39 FEET; THENCE SOUTH

## 8842

22°15'35" EAST 170.99 FEET; THENCE SOUTH 00°28'14" WEST 48.35 FEET TO THE NORTHERLY
LINE OF SAID ENERGY CENTER WAY AS DESCRIBED IN EASEMENT TO THE COUNTY OF SAN
DIEGO RECORDED AUGUST 6, 2002 AS INSTRUMENT NO. 2002-0661038, OFFICIAL RECORDS,
SAID COUNTY; THENCE ALONG SAID NORTHERLY LINE NORTH 89°31'42" WEST 1753.27 FEET
TO THE **TRUE POINT OF BEGINNING**.

CONTAINING 36.961 ACRES / 1,610,019 SQ. FT. MORE OR LESS.

FILED **7/2/09**
BY: **C. Algaze**

PRELIMINARY ACTION DATE: P-17.09
SIGNED BY: *James Beal*

FINAL ACTION DATE: 4/8/2010
SIGNED BY: *Darren Bidlar*

PLAT NO. **BC09-002**



SCALE 1"=600'

A.P.N.:
648-050-017

A.P.N.:
648-050-020

A.P.N.:
648-040-034

A.P.N.:
648-040-034

COVERED STORAGE

OFFICE

RESTAURANT

A.P.N. 648-040-031 & 015

PROPOSED BOUNDARY

A.P.N.:
648-040-028

PROPOSED BOUNDARY

EXISTING BOUNDARY

EXISTING BOUNDARY

A.P.N.:
648-040-017

A.P.N.:
648-040-028

EXISTING BOUNDARY

A.P.N.:
648-040-027

A.P.N.:
648-040-028

A.P.N.:
648-040-023

A.P.N. 648-040-026

CALZADA DE LA FUENTE (ENERGY CENTER WAY)

**EASEMENTS:**
① ROAD ESMT. PER INST#14985, REC. 1/25/62 O.R.
② PUBLIC ROAD ESMT. PER INST#8247, REC. 1/15/65 O.R.
③ CNTY. HWY. ESMT. PER INST#09-0074847, REC. 2/17/09 O.R.
④ CNTY. HWY. ESMT. PER INST#04-0544594, REC. 6/10/04 O.R.
⑤ CNTY. HWY. ESMT. PER INST#02-661043, REC. 8/6/02 O.R.
⑥ CNTY. HWY. ESMT. PER INST#02-661038, REC. 8/6/02 O.R.

**FIRE:** SAN DIEGO RURAL FIRE PROTECTION DISTRICT
**WATER:** OTAY WATER DISTRICT
**SEWER:** COUNTY OF SAN DIEGO
**ZONE:** S88, CONSERVATION/LIMITED USE
HEAVY INDUSTRIAL

**GROSS**
**ADJUSTED AREAS:**
Ⓐ =68.87 AC
Ⓑ =42.84 AC
Ⓒ =11.88 AC
Ⓒ&Ⓓ =36.96 AC

**LEGAL DESCRIPTION**
PORTIONS OF SECTIONS
29 & 30, T18S, R1E, SBM

HEALTH DEPT. CERTIFICATION

VICINITY MAP
NO SCALE
THOS. BROS.
P. 1332, C-7 & D-7

OTAY MOUNTAIN TRUCK TRAIL
CALZADA DE LA FUENTE (ENERGY CENTER WAY)
PASEO DE LA FUENTE
ALTA ROAD
OTAY MESA ROAD
DONOVAN STATE PRISON ROAD
SITE

THIS PLAT WAS PREPARED WITH MY KNOWLEDGE AND CONSENT:

PRINT NAME: *David Wick*  V-P
PRINT NAME: *David Wick*  V-P

MAP PREPARED BY:

MICHAEL J. KNAPTON   7/2/09

APN: 648-040-028
OWNERS: INTERNATIONAL INDUSTRIAL PARK, INC.
ADDRESS: 5440 MOREHOUSE DRIVE, SUITE 4000
CITY: SAN DIEGO   ZIP: 92121
PHONE: (858) 623-9000

APN: 648-040-034, 031, 015 & 017
OWNERS: RANCHO VISTA DEL MAR CORP.
ADDRESS: 5440 MOREHOUSE DRIVE, SUITE 4000
CITY: SAN DIEGO   ZIP: 92121
PHONE: (858) 623-9000

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

FILED

'10 MAY 25 PM 2:14

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

UNITED STATES OF AMERICA )
)
            Plaintiff, )        DECLARATION OF TAKING
)
    vs. )
)
242.93 ACRES OF LAND, MORE OR LESS, )      '10 CV 1133 BEN      CAB
)        CIVIL NO.
SITUATE IN SAN DIEGO COUNTY, STATE OF )
)
CALIFORNIA; AND KYDDLF & RDLFGFT #1, LLC, )
)
ET AL. )
)
)
            Defendants

---

        I, Loren Flossman, Director, Office of Border Patrol Program

Management Office, Facilities Management and Engineering, Office of

Administration, U.S. Customs and Border Protection, Department of Homeland

Security, under the authority delegated to me by the Act of Congress,

approved November 25, 2002, as Public Law 107-296, 116 Stat. 2311 and

codified at 6 U.S.C. Sections 202, 251, 551, and 557, which transferred

certain authorities of the Attorney General to the Secretary of Homeland

Security; and by DHS Delegation No. 7010.3(II)(B), which delegated land

acquisition authority from the Secretary of Homeland Security to the

Commissioner of U.S. Customs and Border Protection; and by CBP Delegation

08-004, which delegated land acquisition authority to the Executive

Director, Facilities Management and Engineering, and by CBP Delegation 09-

003, which further delegated land acquisition authority under $3 million

dollars to Director, Office of Border Patrol Program Management Office,

Facilities Management and Engineering, do hereby make the following

declaration:

1.    The property is hereby taken under and in accordance with the authorities set forth in Schedule "A" attached hereto and made a part hereof.

2.    The public purpose for which said property is taken is set forth in Schedule "B" attached hereto and made a part hereof.  The said land has been selected under my direction for acquisition by the United States for the above-referenced project in San Diego County, State of California.

3.    A general description of the land being taken is set forth in Schedule "C" attached hereto and made a part hereof.

4.    A plan showing the property being taken is shown on Schedule "D" attached hereto and made a part hereof.

5.    The estate taken is described on Schedule "E" attached hereto and made a part hereof.

6.    The sum estimated by the undersigned as just compensation for the land being taken is set forth in Schedule "F" attached hereto and made a part hereof. The undersigned is of the opinion that the ultimate award for said land probably will be within any limits prescribed by law to be paid therefor.

7.    The names and addresses of known parties having or claiming an interest in said property are set forth in Schedule "G" attached hereto and made a part hereof.

8. The United States made best efforts to negotiate purchase of the property interest sought prior to filing this condemnation action.

IN WITNESS WHEREOF, the undersigned, Director, Office of Border Patrol Program Management Office, Facilities Management and Engineering, Office of Administration, U.S. Customs and Border Protection, Department of Homeland Security, hereunto subscribes his name by direction of the Secretary of the Department of Homeland Security, this _6_ day of _MAY_____, 20__ in the City of Washington, District of Columbia.

Loren Flossman

Director

Office of Border Patrol Program Management Office

Facilities Management and Engineering

Office of Administration

U.S. Customs and Border Protection

Department of Homeland Security

# Schedule "A"

SCHEDULE "A"
AUTHORITY FOR THE TAKING

The property is taken under and in accordance with the Act of Congress approved on February 26, 1931, as 46 Stat. 1421 and codified at 40 U.S.C. Section 3114, and the Act of Congress approved August 1, 1888, as 25 Stat. 357 and codified at 40 U.S.C. Section 3113, and any acts supplementary thereto and amendatory thereof; the Act of Congress approved September 30, 1996, as Public Law 104-208, Division C, Section 102, Stat. 3009-546, 3009-554, as amended and codified at 8 U.S.C. Section 1103(b) & note; and the Act of Congress approved October 4, 2006, as Public Law 109-295, Title II, 120 Stat. 1355, which appropriated the funds which shall be used for the taking.

# Schedule "B"

SCHEDULE "B"
PUBLIC PURPOSE

The public purpose for which said property is taken is to conduct surveying, testing, and other investigatory work needed to plan the proposed construction of roads, fencing, vehicle barriers, security lighting, and related structures designed to help secure the United States/Mexico border within the State of California.

# Schedule "C"

SCHEDULE "C"
LEGAL DESCRIPTION

**TRACT SDC-CHU-751 (KYDDLF & RDLFG #1, LLC)**

A tract of land, being the NW ¼ of Sec 29, T 18 S, R 1 E, SBM, according to the official plat thereof, in the County of San Diego, State of California;

**EXCEPTING** therefrom that portion of said NW ¼ described as follows:

**BEGINNING** at the SW corner of said NW ¼ of Sec 29;
THENCE, e'ly along the S line of said NW ¼, N 89° 29' 30" E, 650.00 ft (198.120 m);
THENCE, leaving said S line, N 40° 01' 22" W, 978.0 ft (299.353 m) to a point on the W line of said NW ¼;
THENCE, s'ly along said W line, S 1° 35' 47" W, 755.00 ft (230.124 m) to the **POINT OF BEGINNING**;

And said tract of land, less the exception described above, containing 157.81 ac (63.163 ha) of land, more or less.

**TRACT SDC-CHU-752 (KYDDLF & RDLFG #1, LLC)**

A tract of land in the E ½ NE ¼ of Sec 30, T 18 S, R 1 E, SBM, according to the official plat thereof, in the County of San Diego, State of California, more particularly described as follows:

**BEGINNING** at the NE corner of said E ½ NE ¼ of Sec 30;
THENCE, w'ly along the N line of said E ½ NE ¼ , N 89° 50' 20" W, 799.25 ft (243.611m);
THENCE, leaving said N line, S 1° 01' 09" W, 300.03 ft (91.449 m);
THENCE S 38° 05' 35" E, 532.49 ft (162.303 m);
THENCE S 1° 01' 09" W, 710.42ft (216.536m);
THENCE S 64° 23' 59" E, 1210.19ft (368.867m), to a point on the E line of said E ½ NE ¼ ;
THENCE, n'ly along said E line, N 1° 35' 47" W ,1950.79 ft, (594.60m), to the **POINT OF BEGINNING**;

And said tract of land containing 39.4 ac (15.940 ha) of land, more or less.

**TRACT SDC-CHU-753 (Rancho Vista Del Mar)**

**A TRACT OF LAND**, situate in the SW ¼ NW ¼ of Sec 29 and the E ½ NE ¼ of Sec 30, both in T 18 S, R 1 E, SBM, according to the official plat thereof, located in the County of San Diego, State of California, more particularly described as follows:

**BEGINNING** at the SW corner of said E ½ NE ¼ of Sec 30, being also a point in the center line of Calzada de la Fuente, also known as (Energy Center Way);
THENCE, n'ly along the W line of said E ½ NE ¼, N 1° 54' 42" E, 1347.48 ft (400.71 m) to the most nw'ly corner of said Tract of Land;
THENCE, leaving said W line, S 87° 35' 49" E, 200.01 ft (60.964 m) to the most ne'ly corner of said Tract of Land;
THENCE, S 0° 05' 57" E, 72.10 ft (21.978 m);
THENCE, S 64° 23' 59"E, 1210.19 ft (368.867 m)

Declaration of Taking - 6

THENCE, S 01° 07' 23"W, 755.00 ft (230.124 m)
SAID POINT BEING  SE corner of said E ½ NE ¼ of Sec 30 and SW corner of said SW ¼ NW ¼ of Sec 29;
THENCE, N 89° 30' 15" W, 1315.32 ft (400.910 m) to the **POINT OF BEGINNING;**

And said Tract of Land containing 32.0 ac (12.961ha) of land, more or less.

**TRACT SDC-CHU-754 (D & D Landholdings)**

**A TRACT OF LAND**, in the NW ¼ SW ¼ of Sec 29, T 18 S, R 1 E, SBM, according to the official plat thereof, in the County of San Diego, State of California, said Tract of Land having APN 648-040-39;

**BEGINNING** at the NW corner of said NW ¼ SW ¼;
THENCE, e'ly along the n'ly line of said NW ¼ SW ¼, N 89° 29' 30" E, 133.98 ft (40.837 m);
THENCE, leaving said n'ly line, S 25° 35' 42" E, 1493.23 ft (455.137 m) to a point in the s'ly line of said NW ¼ SW ¼;
THENCE w'ly along the s'ly line of said NW ¼ SW ¼, S 89° 40' 38" W, 688.19 ft (209.760 m), more or less, to an intersection with the e'ly line of a portion of that land described in Grant Deed to Alta Parcels, LLP, dated and recorded May 6, 2008, as Doc #243036 with the Recorder of said county, and said portion of said and having APN 648-040-41;
THENCE n'ly along the e'ly line of said portion of said land and parallel with the w'ly line of said NW ¼ SW ¼, N 1° 07' 23" W, 311.35 ft (94.898 m), more or less, to the most ne'ly corner of said portion of said land;
THENCE e'ly and parallel with the s'ly line of said NW ¼ SW ¼, S 89° 40' 38" W, 117.35 ft (35.767m) to a point in the w'ly line of said NW ¼ SW ¼;
THENCE n'ly along said w'ly line, N 1° 07' 23" W, 1038.90 ft (316.657 m) to the **POINT OF BEGINNING;**

And said Tract of Land containing 13.722ac (5.553ha) of land, more or less.

# Schedule "D"

SCHEDULE "D"



1    **TRACT SDC-CHU-751 (KYDDLF & RDLFG #1, LLC)**

2    A tract of land, being the NW ¼ of Sec 29, T 18 S, R 1 E, SBM, according to
     the official plat thereof, in the County of San Diego, State of California;
3    said Tract of Land having APN 648-050-17-00

4    And said tract of land, less the exception described above, containing
     157.81 ac (63.163 ha) of land, more or less.

5

6    **TRACT SDC-CHU-752 (KYDDLF & RDLFG #1, LLC)**

7    A tract of land in the E ½ NE ¼ of Sec 30, T 18 S, R 1 E, SBM, according to
     the official plat thereof, in the County of San Diego, State of California;
     said Tract of Land having APN 648-050-20-00

8
     And said tract of land containing 39.4 ac (15.940 ha) of land, more or less.
9

10   **TRACT SDC-CHU-753 (Rancho Vista Del Mar)**

11   **A TRACT OF LAND**, situate in the SW ¼ NW ¼ of Sec 29 and the E ½ NE ¼ of Sec
     30, both in T 18 S, R 1 E, SBM, according to the official plat thereof,
12   located in the County of San Diego, State of California; said Tract of Land
     having APN 648-040-34-00

13   And said Tract of Land containing 32.0 ac (12.961 ha) of land, more or less.

14   **TRACT SDC-CHU-754 (D & D Landholdings)**

15
     A tract of land, in the NW ¼ SW ¼ of Sec 29, T 18 S, R 1 E, SBM, according
16   to the official plat thereof, in the County of San Diego, State of
     California; said Tract of Land having APN 648-040-39-00;

17   And said Tract of Land containing 13.722 ac (5.553 ha) of land, more or
     less.

18

19   — **PROPOSED TAKING (Acquisition)**

20

21

22

23

24

25

# Schedule "E"

SCHEDULE "E"
ESTATE TAKEN

The estate taken is a temporary, assignable easement beginning on the date possession is granted to the United States and ending 12 months later, consisting of the right of the United States, its agents, contractors, and assigns to enter in, on, over and across the land described in Schedule "C" to survey, make borings, and conduct other investigatory work for the purposes described in Schedule "B" and to access adjacent lands; including the right to trim or remove any vegetative or structural obstacles that interfere with said work; reserving to the landowners, their successors and assigns all right, title, and privileges as may be used and enjoyed without interfering with or abridging the rights hereby acquired; subject to minerals and rights appurtenant thereto, and to existing easements for public roads and highways, public utilities, railroads and pipelines.

# Schedule "F"

SCHEDULE "F"
ESTIMATE OF JUST COMPENSATION

The sum estimated as just compensation for the land being taken is ONE HUNDRED DOLLARS ($100.00), to be deposited herewith in the registry of said Court for the use and benefit of the persons entitled thereto; and an additional sum determined at the conclusion of the temporary estate described in Schedule "E" to constitute actual damages, if any.

# Schedule "G"

1

                              SCHEDULE "G"
2              NAMES AND ADDRESSES OF INTERESTED PARTIES:

3

4    KYDDLF & RDLFGFT #1, LLC, a California limited liability company
     American International Racing, Inc., Registered Agent
     5440 Morehouse Drive, Ste. 4000
5    San Diego, California 92121

6    Rancho Vista Del Mar, a California corporation
     American International Racing, Inc., Registered Agent
7    5440 Morehouse Drive, Ste. 4000
     San Diego, California 92121'

8    D & D Landholdings, a California limited partnership
     American International Racing, Inc., Registered Agent
9    5440 Morehouse Drive, Ste. 4000
     San Diego, California 92121

10
     OMC Properties, LLC
11   David Wick, Registered Agent
     5440 Morehouse Drive, Ste. 4000
12   San Diego, California 92121

13

14

15

16

17

18

19

20

21

22

23

24

25

| 1927 Fifth Avenue | 525 W. Wetmore Rd., Ste 111 | 1504 West Fifth Street | 2027 Preisker Lane, Unit G |
|---|---|---|---|
| San Diego, CA 92101 | Tucson, AZ 85705 | Austin, TX 78703 | Santa Maria, CA 93454 |
| P 619.308.9333 | P 520.325.9977 | P 512.478.0858 | P 619.308.9333 |
| F 619.308.9334 | F 520.293.3051 | F 512.474.1849 | F 619.308.9334 |
| www.recon-us.com | | | |



*A Company of Specialists*

August 9, 2011

Mr. Brett Norris
Assistant U.S. Attorney
Southern District of California
880 Front Street, Suite 6293
San Diego, CA  92101

Reference:  Biological Summary Report (RECON Number 6316)

Dear Mr. Norris:

Pursuant to your request, RECON Environmental, Inc. (RECON) has conducted research regarding the biological status of approximately 242 acres of land in the vicinity of Calzada de la Fuente and the Otay Truck Trail.  We also accompanied your staff on a field visit to the area.  The focus of our research was in regards to the temporary (approximately one year) entry access to this area for inspection, survey, and testing.  As you know, portions of the 242-acre area have been set aside as easements in conjunction with the mitigation requirements for individual project approvals (e.g., County of San Diego Major Use Permits 98-001 and 98-001W1) within the East Otay Mesa Specific Planning Area in the County of San Diego.  The area outside of the existing easements is subject to the requirements of the County's Multiple Species Conservation Program (MSCP).  Figure 1 shows the boundary of the 242 acres along with the various open space easements.

Biologically, these lands consist primarily of southern mixed chaparral, grasslands, and coastal sage scrub vegetation communities.  In addition, a variety of sensitive plant and animal species have the potential to occur within the area (2008 e$^2$M Biology Survey Report).  There are currently multiple access routes that exist throughout the 242-acre area (e.g., SDG&E transmission line easements).  These access routes (see Figure 1) within the area currently receive use by a variety of users including SDG&E and the Border Patrol.

As shown in Figure 1, there are a total of five biological easements within the 242-acre area.  These parcels were granted either as open space easements or conservation easements and are subject to the conditions prescribed in the Major Use Permits (MUPs).  The easements were granted to either the County of San Diego or the California Department of Fish and Game and are for the protection of sensitive biological resources pursuant to the County's Biological Mitigation Ordinance (BMO).  Within each of these easements, the allowable uses per the MUP conditions are limited to selected hand clearing for fire management purposes, revegetation pursuant to a habitat management plan, or vegetation removal for vector control purposes.

The acreage outside of the easements is subject to the County of San Diego MSCP.  The MSCP is a comprehensive habitat conservation plan (HCP) that has been adopted by the County.  An MSCP Subarea Plan (South County) has been adopted for this area and several MSCP designations have been applied to these other open space lands which to guide the long-term conservation of biological resources.  Figure 2 shows the MSCP categories within the areas generally east and south of the existing open space and conservation easements.  These MSCP

Mr. Brett Norris
Page 2
August 9, 2011

categories include Major and Minor Amendment Areas, Covered Species Take Authorization Areas, and Hardline Preserve Areas.  A brief description of these MSCP categories, which prioritize the assembly of the overall MSCP preserve, is provided below.  Land uses allowed within the MSCP preserve are generally limited to those uses that are compatible with the protection of natural resources, and may include continuation of existing uses, public access and recreation, and infrastructure.

*Covered Species Take Authorization Area* – Typically, take authorization areas may be developed without any further biological review because "take" as defined by the Endangered Species Act has already been adequately mitigated in the form of land set aside as "Hard Lined" preserves during the negotiations between the landowners, wildlife agencies and County during preparation of the Subarea Plan" (*County Biology Guidelines for Determining Significance*).

*Minor Amendment Area* – Minor amendment lands are lands that are not currently part of the MSCP Subarea Plan and that contain habitat that could be partially or completely eliminated (with appropriate mitigation) without significantly affecting the overall goals of the County's Subarea Plan.  Minor Amendment areas may also require Special Considerations which in the case of the South County Subarea Plan includes requirements outlined in the East Otay Mesa Specific Plan.

*Major Amendment Area* – Major Amendment lands are also not currently a part of the MSCP Subarea Plan and are lands for which an agreement was not reached between the applicable parties prior to approval of the Subarea Plan.  However, unlike Minor Amendment areas, Major Amendment areas have a high probability of supporting biological resources critical to the success of the MSCP (either by location within core and linkage areas or by the resources identified on the site).  Developments proposed within Major Amendment areas require a formal amendment to the Subarea Plan, NEPA compliance, Federal Register Noticing, and concurrence of the Regional Offices of the U.S. Fish and Wildlife Service (Portland) and the California Department of Fish and Game (Sacramento).

*Hardline Preserve Area* – "Hard line" preserves are those areas specifically delineated on a map.  These areas include land that is either publicly owned, or land that has been the subject of negotiated agreements with the property owners.  The "hard lines" depict areas that will be included in the Multiple Species Conservation Program preserve.

Based on our review of these MUP and MSCP requirements, existing biological documentation and site conditions, field visit, and extensive working experience with habitat conservation plans in San Diego County and the southwestern United States, it is our professional opinion that the habitat functions and values of the area would not be impaired or compromised by the temporary entry access.  The scope of the temporary entry access would be consistent with the existing levels of use of the area and would not be inconsistent with the requirements of the adopted MSCP South County Subarea Plan and the MUP easement conditions.  Such temporary entry access would also not diminish the existing habitat functions and values or degrade the mitigation value of these habitats for future projects.

Please contact me if you have any questions.

Sincerely,

Paul Fromer
Principal

PSF:sh



Image source: Microsoft Virtual Earth

Right of Entry   **County of SD MSCP Sub Area Plan**

Parcels

- Hardline Preserve Area
- Major Amendment Area
- Minor Amendment Area
- Minor Amendment Area Subject to Special Considerations
- Covered Species Take Authorization

FIGURE 2

MSCP Designations

M:\JOBS4\6316\common_gis\fig2_DOJ.mxd  8/8/2011

Image source: Microsoft Virtual Earth

6480110300
6480110200
6480200700
6480200600
6480200500
6480403100
6480405500
6480404900
6480404900
6480502000
6480500200
6480501700
6480402600
6480402700
6480500500
6480404900   6480405100
6480405600
6480405500
6480402300
6480404500
6480404700
6480501400
6480401100
6480404600
6480403900
6480501300
6480501200
6480404800
6480404300   6480404100
6480401300   6480403500   6480403800   6480403700   6480404000

| | | |
|---|---|---|
| Right of Entry | Open Space Easement 1 | Conservation Easement 1 |
| Parcels | Open Space Easement 2 | Conservation Easement 2 |
| | Open Space Easement 3 | |

0   Feet   500



FIGURE 1

Open Space & Conservation Easements

RECON
M:\JOBS4\6316\common_gis\fig1_DOJ.mxd   8/8/2011

### Statement of Fees for Appraisal Regarding United States v. 242.93 Acres
### by Jones, Roach & Caringella, Inc.

Our appraisal of the subject property was provided pursuant to Contract Number 11W-USA98-0109. The contract provides for fees on an hourly basis. The current hourly rates for this assignment are $350 for Mr. Roach and $225 for Mr. Knox. The hourly rate for deposition or trial testimony is $400 for Mr. Roach.

### List of Publications for Stephen D. Roach, MAI

See Curriculum Vitae

| Testimony Experience Since August 2007 Stephen D. Roach, MAI, SRA | |
|---|---|
| **Case Name** | **Type** |
| Patella v. Del Cerro Heights, et al | Deposition (10/2007)/Trial (12/2007) |
| City of Escondido v. Kuebler | Deposition (10/2007)/Trial (8/2008) |
| Sullivan Hill v. Yarpezeshkan | Deposition (12/2007) |
| Caltrans v. TRE, Inc. | Deposition (1/2008) |
| Coronado City Views LLC v. Regatta Bay, et al | Deposition (1/2008)/Trial (3/2008) |
| United States v. 14.30 Acres | Deposition (6/2008) |
| Escondido Drive-Inn v. Shop Smart Escondido | Deposition (7/2008)/Arbitration (12/2008) |
| City of Tustin v. AAE Park Associates | Deposition (7/2008)/Trial (10/2009) |
| Otay Mesa Property, et al. v. United States | Deposition (7/2008)/Trial (10/2008) |
| Rutherford v. United States | Deposition (9/2008) |
| Caltrans v. Handler, et al | Deposition (11/2008) |
| Caltrans v. Imperial Grain Growers, Inc. | Deposition (11/2008) |
| Caltrans v. Cameron Brothers, et al | Deposition (11/2008) |
| Elsinore Valley MWD v. O'Doherty, et al | Deposition (11/2008)/Trial (12/2009) |
| 4S Kellwood v. Geocon | Deposition (12/2008) |
| City of Laguna Woods v. Raintree Realty | Deposition (12/2008)/Trial (8/2010) |
| Coronado City Views v. Regatta Bay (bankruptcy) | Deposition (1/2009)/Trial (1/2009) |
| Tartre/Armstrong v. Poway | Deposition (4/2009)/Trial (6/2009) |
| American National Investments v. Watt Lofts, et al | Deposition (4/2009) |
| VMA Palomar v. Farmers and Merchants Trust, et al | Deposition (5/2009)/Trial (9/2009) |
| CJUSD v. Thompson, et al | Deposition (6/2009) |
| BDI - II, LLC v. Woods, et al. | Deposition (7/2009)/Trial (8/2009) |
| Caltrans v. Prospect Industrial Park | Deposition (8/2009) |
| United States v. 32.42 Acres | Deposition (8/2009)/Trial (4/2010) |
| Port of San Diego/Pacific Gateway | Deposition (8/2009)/Arbitration (11/2009) |
| Somo v. Chevron | Deposition (9/2009)/Trial (9/2010) |
| Y.H. Ellis, LLC v. First American Title Insurance Co. | Deposition (11/2009) |
| Seymour Lewis v. Chula Vista, et al | Deposition (12/2009) |
| Blue Barn Associates v. Honey Baked Hams, Inc. | Deposition (1/2010)/Trial (5/2010) |
| Silvergate Financial v. Asbury, et al | Deposition (3/2010) |
| City of Sacramento v. Thomas Enterprises | Arbitration (3/2010) |
| Cal-Sorrento, Ltd. v. Caltrans | Deposition (6/2010) |
| MKR v. Lee & Associates, et al | Deposition (8/2010)/Trial (10/2010) |
| Giannella v. Cardone, et al | Deposition (8/2010) |
| Zivku v. DeLuca | Trial (1/2011) |
| Marina Pacifica HOA v. Southern California Financial Corporation/Lansdale | Deposition (2/2011)/Trial (3/2011) |
| Caltrans v. Zora | Deposition (2/2011) |
| SSC Acquisitions & SunCal La Quinta v. Eston, et al | Deposition (3/2011)/Trial (4/2011) |
| NV Energy v. Tiberti | Deposition (4/2011) |

US v. 242.93 Acres - Temporary Right of Entry                                    Addenda

| Testimony Experience Since August 2007 Stephen D. Roach, MAI, SRA | |
|---|---|
| **Case Name** | **Type** |
| Raceway Ford, et al v. State of California | Deposition (6/2011) |
| Knorr v. Stonebreaker | Deposition (6/2011)/Trial (7/2011) |
| Clark County v. NTL | Deposition (7/2011) |
| Clark County v. 4444 | Deposition (7/2011) |

Qualifications of Stephen D. Roach, MAI, SRA          Addenda

# Stephen D. Roach, MAI, SRA

**Educational Background**

B.S. degree in Real Estate, San Diego State University - 1978 (Graduated Summa Cum Laude)

Professional Courses Completed:

| | |
|---|---|
| Capitalization Theory and Techniques | 1979, 1986, 1988 |
| Real Estate Investment Analysis | 1982 |
| Real Estate Appraisal Principles | 1984 |
| Basic Valuation Procedures | 1984 |
| Standards of Professional Practice | 1984, 1987, 1992, 1999, 2003, 2005, 2007, 2008, 2011 |
| Business Practices and Ethics | 2008 |
| Case Studies in Real Estate Valuation | 1985 |
| Valuation Analysis and Report Writing | 1985 |

Seminars Attended:

| | |
|---|---|
| Land Use | 1980 |
| Real Estate Risk Analysis | 1983 |
| Subdivision Analysis | 1984 |
| Appraising Commercial Properties | 1985 |
| Appraising for the Institutional Investor | 1987 |
| Subdivision Analysis | 1987 |
| Valuation of Lease Interests | 1987 |
| Faculty Training Seminar | 1988 |
| Appraising From Plans and Specifications | 1988 |
| Apartment Seminar | 1990 |
| Planning and Land Use | 1990 |
| Demographics and Feasibility Analysis | 1990 |
| Litigation Seminar | 1984, 1986, 1989, 1990, 1992, 1994, 1996, 2007 |
| State Licensing and Certification Seminar | 1991 |
| Understanding Limited Appraisals & Appraisal Reporting Options: General | 1994 |
| Understanding Environmental Contamination in Real Estate | 1999 |
| Fair Lending and the Appraiser | 1994 |
| OREA Federal and State Laws and Regulations | 1995, 1999 |
| Dynamics of Office Building Valuation | 1995 |
| Case Studies in Limited Partnership and Common Tenancy Valuation | 2002 |
| San Diego Economic Forecast | 2006 |
| Legal Aspects of Easements | 1984 |
| The Skills of Expert Testimony | 1988 |
| Easement Valuation | 1990 |
| Understanding Environmental Contamination in Real Estate | 1999 |
| The Comprehensive Appraisal Workshop | 1989 |
| Pan Pacific Congress of Valuers | 2004 (Taiwan, R.O.C.), 2006 (USA), 2008 (Korea) |
| Uniform Appraisal Standards for Federal Land Acquisitions | 2007 |
| XXV Union of PanAmerican Associations of Valuers Congress | 2010 |
| Appraising for the IRS: What you Need to Know | 2011 |

**Appraisal Experience**

Principal - Jones, Roach & Caringella, Inc. (previously Jones & Roach, Inc.), since 1986

Appraiser/Consultant - Andrew A. Smith Co., 1979-1986

**Expert Witness, Mediation, Arbitration, and Court Experience**

Superior Court: San Diego, Los Angeles, Ventura, Riverside, and Orange Counties, CA

Federal Court: San Diego, CA; Phoenix, AZ; New York, NY

Administrative Law Hearing: Los Angeles, CA

Arbitration Panel Member: San Diego, CA

Numerous Mediations and Arbitrations

Qualifications of Stephen D. Roach, MAI, SRA                                      Addenda

**Professional Affiliations**
Member, Appraisal Institute (MAI No. 7490; SRA)
 Currently certified under Appraisal Institute continuing education program
 San Diego Chapter Professional Standards/Ethics Education Committee Chair (1993-1995)
 Member of Region VII Regional Committee (1993)
 Director of San Diego Chapter (1989-1992) and Member of Admissions Committee (1988-1991)
 Chief Course Reviewer for Appraisal Institute Courses 510, 700, 705, and 715 (2001-2009)
 Chief Course Reviewer for Appraisal Institute Course 310 (1996-2001)
 Course Content Expert Team member for Appraisal Institute courses General Appraiser Income Approach/Parts 1 and 2
  (2010-current)
 Course Content Expert Team member for Appraisal Institute courses The Appraiser as an Expert Witness: Preparation and
  Testimony, Condemnation Appraising: Principles and Applications, and Litigation Appraising: Specialized Topics and
  Applications (2010-current)
 Member of Curriculum Subcommittee, National Education Committee (1996-2004; Chair 1999-2001)
 Member of General Comprehensive Examination Panel (2002-current)
 Member of Education Committee (1999-2001; 2006-2009) and Qualifying Education Committee (1999-2001)
 Vice-Chair of Education Committee (2008-2009)
 Chair of International Relations Committee (2010-current); Vice-Chair of International Relations Committee (2010)
 Member of Strategic Planning Committee (2010-current)
 Member of 717 Qualifying Education Reorganization Project Team (2002-2009)
 Member of Advanced Education Specification Team (2006-2007)
 Chair of Core Competency Project Team (2008-2011)
California Certified General Real Estate Appraiser (No. AG002159)
Nevada Certified General Real Estate Appraiser (No. A.0206288-CG)
Arizona Certified General Real Estate Appraiser (No. 31475 - Expired)
Member, International Right-of-Way Association (Served as a Director of San Diego Chapter 11 from 1999-2007)
Member, Lamda Alpha International (Honorary Society for the Advancement of Land Economics) (2010-current)
Principal Member, Real Estate Counseling Group of America (2010-current)

**Professional Honors**
Awarded 2010 President's Award for outstanding service to the Appraisal Institute
Awarded 2009 Chapter Service Award for outstanding service to the San Diego Chapter of the Appraisal Institute
Awarded 2004 Chapter Service Award for outstanding service to the San Diego Chapter of the Appraisal Institute
Awarded 2003 Dr. William N. Kinnard, Jr., PhD Award for outstanding contributions to Appraisal Institute education
Discussion Leader - 1993 Appraisal Institute Young Advisory Committee Meeting, Washington, DC
Invited Participant - 1991 and 1992 Appraisal Institute Young Advisory Committee Meetings

**Types of Appraisals/Properties Appraised**

| | | |
|---|---|---|
| Agricultural | Leasehold and Leased Fee Interests | Residential Income Properties |
| Auto Dealerships | LLC Interests | Residential Subdivision Acreage |
| Commercial Condominiums | Master-Planned Communities | Restaurants |
| Contaminated Properties | Mini Storage Facilities | Retail/Regional Malls |
| Easements | Mitigation and Open Space Land | Reviews |
| Fractional Interests | Office and Medical Office Buildings | Single Family Residences |
| Historical (Retrospective) Appraisals | Partial Acquisitions | Tidelands Properties |
| Hotels/Motels/SRO Hotels | Partnership Interests | Vacant Land |
| Indian Reservations | Research and Development | Wetlands |
| Industrial Properties | Residential Condominiums | |

Qualifications of Stephen D. Roach, MAI, SRA                                          Addenda

## Partial List of Clients - Lenders, Developers, and Investors

| | | |
|---|---|---|
| The Allen Group | Gatlin Development | Ohio State Teachers Retirement Fund |
| American Assets, Inc. | Genstar Land Company | Pardee Construction Company |
| American National Investments, Inc. | Great American Bank | Phase One Development |
| Bank of America NT&SA | Griffin Properties | Premier Coastal Development |
| Bank of California | Hearthstone Realty Advisors | Raintree Realty, LLC |
| Bank of San Diego | Home Capital Development Corp. | Robinhood Development |
| Bascom Group | HomeFed Bank | Sammis Properties |
| BHA Properties | Hunt Building Corp. | San Diego National Bank |
| Boardwalk Development | Imperial Federal Savings Association | Security Pacific National Bank |
| Bosa Development | Inland American Real Estate Trust | Seymour Lewis Development |
| Buie Corporation | Inland Western Retail Real Estate Trust | Southern California Financial Corp. |
| California First Bank | Intergulf Development | Starwood Development, LP |
| Century West Development | Janopaul + Block Co. | Sunroad Enterprises |
| Citicorp Acceptance Company | Kelwood Development Company | Thomas Enterprises |
| Citicorp Real Estate, Inc. | Kilroy Realty | Union Bank |
| City National Bank | Legacy Commercial Partners | Universal Medical Buildings |
| Coast Federal Bank | Lincoln Savings, F.A. | Wells Fargo Bank |
| ColRich Development | The McMillin Companies | Westwind Development |
| Fenton Western Properties | NationsBank | Western Devcon |
| First Interstate Bank | Nexus Development Corporation | Western Financial Savings Bank |
| Garden Communities | | Western Pacific Development |

## Partial List of Clients - Public Agencies

| | | |
|---|---|---|
| California Dept. of Transportation | City of Tustin | Riverside County Flood Control Dist. |
| Cardiff School District | Clark County (NV) | San Diego Metropolitan Transit System |
| Centre City Devel. Corp. (CCDC) | Colton Joint Union School District | San Diego Unified School District |
| Chaffey Joint Union HS District | County of San Diego | San Diego Unified Port District |
| City of Chula Vista | Cucamonga Valley Water District | Southeast Economic Devel. Corp. |
| City of Corona | Elsinore Valley MWD | State of California |
| City of Coronado | Fallbrook Union Elementary District | 22nd District Agricultural Association |
| City of Escondido | Fallbrook Union High School District | United States Air Force |
| City of Fontana | Nevada Department of Transportation | United States Army Corps of Engineers |
| City of Lake Forest | North County Transit District | United States Bureau of Indian Affairs |
| City of Murrieta | Oceanside Redevelopment Agency | Unites States Bureau of Reclamation |
| City of Oceanside | Oceanside Unified School District | United States Department of Justice |
| City of Ontario | Orange County Trans. Authority | United States Forest Service |
| City of Poway | Orange County Flood Control District | United States Internal Revenue Service |
| City of San Buenaventura | Rancho California Water District | United States Navy |
| City of San Diego | Regents of the University of California | United States Postal Service |
| City of Santee | Resolution Trust Corporation (RTC) | Western Municipal Water District |
| City of Thousand Oaks | Rialto Unified School District | |

Qualifications of Stephen D. Roach, MAI, SRA                                    Addenda

## Partial List of Clients - Corporations and Individuals

| | | |
|---|---|---|
| Ace Parking | Fraser Engineering Corporation | McDonalds Corporation |
| ARCO Petroleum Products Company | General Mills Restaurants, Inc. | Mobil Oil Corporation |
| Bob Baker Enterprises | Grace International Church | Motorola, Inc. |
| Carl Karcher Enterprises | Greyhound Corporation | NV Energy |
| Century Life Church | Honey Baked Ham, Inc. | San Diego Gas & Electric Co. |
| Chicago Title Insurance Company | Insurance Company of the West | San Diego Harbor Excursion |
| Circle Line Statue of Liberty Ferry | International Transportation Service, Inc. | Science Applications International |
| Coldwell Banker Realty Advisory Services | John Burnham Company | Service Corporation International (SCI) |
| Columbia/HCA | Judge Gilbert Harelson (Retired) | Southern California Edison |
| Cost Plus | Judge Ross Tharpe (Retired) | Shell Oil |
| Crossword Christian Church | Judge Robert C. Thaxton (Retired) | Robert Sinclair |
| First American Title Insurance Co. | Kaiser Hospitals | Texaco Oil |
| Fleming Companies | La Salle Partners | Waste Management Corporation |
| Ford Motor Company | Lucky Stores | YMCA |

## Partial List of Clients - Attorneys and Law Firms

| | | |
|---|---|---|
| Allen Matkins | Haight, Brown & Bonesteel | Procopio, Cory, Hargreaves & Savitch |
| Arrache, Clark & Potter | Higgs, Fletcher & Mack | John H. Reaves, Attorney at Law |
| Asaro, Keagy, Freeland & McKinley | Hillyer & Irwin | Rockwood & Noziska |
| Baker & McKinzie | Hinchy, Witte, Wood, Anderson | Saxon, Dean, Mason, Brewer & Kincannon |
| Ballard Spahr LLP | Jennings, Engstrand & Henrikson | Schaefer & Smith |
| Benjamin, Weill & Mazer | K&L Gates | Schall, Boudreau, Gore |
| Berger & Norton | Keeney Waite & Stevens | Schwartz Semerdjian Haile Ballard & Cauley |
| Best Best & Krieger | Kirby Noonan Lance & Hoge | |
| Law Offices of David Boss | Latham & Watkins | Sean Schwerdtfeger, Attorney at Law |
| Broad & Cassel | Lempres & Wulfsberg | Seltzer Caplan McMahon Vitek |
| Brobeck, Phleger & Harrison | Lewis, D'Amato, Brisbois & Bisgaard | Sheppard, Mullin, Richter & Hampton |
| Bronson, Bronson & McKinnon | Lobel, Winthrop & Broker | Sierra Club Legal Defense Fund |
| Chapman Law Firm | Lounsbery Ferguson | Silldorf Burdman |
| Daley & Heft | Luce, Forward, Hamilton & Scripps | Solomon Ward Seidenwurm & Smith |
| DLA Piper | McKenna & Cuneo | Songstad & Randall LLP |
| Ducor Spradling & Metzger | Meisenheimer Herron & Steele | Sparber, Ferguson, Ponder & Ryan |
| Eischen & Associates | Meyers & McConnell | Stutz Artiano Shinoff & Holtz |
| Endeman, Lincoln, Turek & Heater | Meyers Nave Riback Silver & Wilson | Sullivan Hill Lewin Rez & Engel |
| Epsten & Grinnell | Miller & Giannini | Wertz McDade Wallace & Moot |
| Foley & Lardner | Monaghan & Metz | Thorsnes Bartolotta & McGuire |
| Glenn, Wright, Jacobs & Schell | Morris, Polich & Purdy | Treitler & Montisano |
| Lou Goebel | Neil Dymott Perkins Brown & Frank | Turner & Williams |
| Golub & Morales | Olmstead, Hughes & Garrett | Valorem Law Group |
| Gordon & Holmes | Orrick, Herrington & Sutcliffe | Walker, Wright, Tyler & Ward |
| Gordon & Rees | Palmieri, Tyler, Wiener, Wilhelm & Waldron | Mark Wasser, Attorney at Law |
| Grant, Genovese & Baratta, LLP | | Wilke, Fleury, Hoffelt, Gould & Birney |
| Gray, Cary, Ware & Friedenrich | Peterson Martin Reynolds LLP | Wood Smith Henning & Berman LLP |
| Greenberg Traurig LLP | Pillsbury Madison & Sutro | Worden, Williams |
| Grimm, Vranjes, McCormick & Graham | Terry Plummer, Attorney at Law | Worley, Schwartz, Garfield & Rice |
| Guevara, Phippard & James | | |

**Instructor Experience (Appraisal Institute Courses and Seminars)**

**Basic Income Capitalization**
San Diego, CA: 11/91, 9/92, 10/93, 6/97, 7/03, 7/04, 6/05, 6/06
Los Angeles, CA: 3/91, 6/95
West Springfield, MA: 4/93
Orlando, FL: 5/94
Tuscaloosa, AL: 9/94
Pittsburgh, PA: 2/95
Phoenix, AZ: 2/96
Washington, D.C.: 8/96, 8/98
Chicago, IL: 6/97
West Palm Beach, FL: 8/99
Seoul, South Korea: 6/01
Seattle, WA: 3/07

**General Appraiser Income Approach/Part 1**
San Diego, CA: 6/08

**General Appraiser Income Approach/Part 2**
San Diego, CA: 2/07

**Advanced Income Capitalization**
San Diego, CA: 9/89, 11/91, 10/92, 6/99, 6/01, 6/07, 6/09, 6/10;
    6/11
Las Vegas, NV: 9/05
Los Angeles, CA: 6/90, 4/94, 7/04
Phoenix, AZ: 4/03
Chapel Hill, NC: 7/91
Dallas, TX: 5/92
Orlando, FL: 10/92
Salt Lake City, UT: 11/97
Portland, OR: 10/01
Dublin, CA: 6/02
Seoul, South Korea: 6/03
Sacramento, CA: 5/06
Chicago, IL: 5/07; 7/10
Seattle, WA: 8/09

**Appraisal Review - General**
Mission Viejo, CA: 8/04
Las Vegas, NV: 10/06
San Diego, CA: 10/07

**What Clients Want Their Appraisers to Know**
Portland, OR: 9/06

**Office Building Valuation: A Contemporary Perspective**
Albuquerque, NM: 1/08
Sacramento, CA: 2/08
Las Vegas, NV: 3/08
Topeka, KS: 4/08
San Diego, CA: 10/08
Irvine, CA: 11/08

**Rates and Ratios: Making Sense of GIMs, OARs, and DCF**
Mission Viejo, CA: 9/03
Portland, OR: 5/04
Phoenix, AZ: 04/06
Las Vegas, NV: 07/07

**The Dynamics of Office Building Valuation**
El Paso, TX: 10/95
Sacramento, CA: 1/96
San Diego, CA: 10/96
Phoenix, AZ: 5/97
Orange County, CA: 10/99
Buellton, CA: 9/01

**Litigation Skills for the Appraiser: an Overview**
Phoenix, AZ: 04/06
Las Vegas, NV: 10/06
Salt Lake City, UT: 2/07

**Litigation Appraising: Specialized Topics and Applications**
San Diego, CA: 6/02, 6/05, 10/08
Birmingham, AL: 4/03
San Jose, CA: 3/04
Las Vegas, NV: 10/04, 3/10
Los Angeles, CA: 3/06
Portland, OR: 9/06
Chicago, IL: 5/08
Oakland, CA: 11/08
Tucson, AZ: 4/11

**Condemnation Appraising: Principles and Applications**
Las Vegas, NV: 7/09
San Diego, CA: 9/09
Sacramento, CA: 12/09
Costa Mesa, CA: 9/10
Orlando, FL: 10/10
Oakland, CA: 3/11

**Condemnation Appraising: Basic Principles and Applications**
Chicago, IL: 10/98, 10/00, 5/04, 8/06
San Diego, CA: 10/98, 6/00, 8/04
Portland, OR: 2/99
Los Angeles, CA: 5/99
Boulder, CO: 6/99
Phoenix, AZ: 5/00
Seattle, WA: 10/00, 9/03
Sacramento, CA: 3/01, 6/05
San Francisco, CA: 3/00, 11/03, 3/05

**Condemnation Appraising: Advanced Topics and Applications**
Portland, OR: 2/99
Los Angeles, CA: 5/99
Phoenix, AZ: 5/00
San Diego, CA: 6/00, 8/04
Sacramento, CA: 3/01, 6/05
Seattle, WA: 9/03
San Francisco, CA: 3/00, 11/03
Chicago, IL: 5/04, 8/06

**The Appraiser as an Expert Witness: Preparation and Testimony**
San Diego, CA: 12/06, 4/09, 10/10
Chicago, IL: 5/08
San Jose, CA: 5/10

**Instructor Experience (continued)**

Course Developer/Instructor - Condemnation Appraising: International Center for Land Policy Studies and Training; Taoyuan, Taiwan, Republic of China: 10/04, 10/05, 10/06, 9/07, 4/08, 4/09, 4/10

Guest Lecturer at National Taipei University, Taipei, Taiwan: 10/06, 9/07, 4/08, 4/09

Guest Lecturer at National Chengchi University, Taipei, Taiwan: 4/10

Guest Lecturer at SDSU, UCSD, and Point Loma Nazarene University

Course Instructor - Valuation of Contaminated Properties (IR/WA Course 407): San Diego, CA: 11/99

Co-Instructor - The Comprehensive Appraisal Workshop: 1/90

Seminar Developer/Instructor - "Fast and Furious": 6/04

Seminar Instructor - "State Licensing and Certification": 8/91

Seminar Panel Member - "Discounted Cash Flow Analysis in the Homebuilding Industry": 3/93

Seminar Moderator/Panel Member - "The Impact of Hazardous Materials on Real Estate": 9/93

Seminar Panel Member - IR/WA Condemnation Seminars/Case Updates: 9/94, 10/95, 6/05 (San Diego, CA); 5/11 (Sacramento, CA)

Seminar Panel Member - "Taking 'Special' out of Benefits": 9/97, 10/97, 1/98

Seminar Panel Member - "Eminent Domain in California", Oakland, CA: 12/05

Seminar Panel Member - "Law of Easements in CA: Legal Issues and Practical Considerations", San Diego, CA: 2/06

Co-Presenter - "Materialization of Protection of Property Rights" (Presentation to 24th Pan Pacific Congress), Seoul, Korea: 8/08

Seminar Panel Member - "Public Interest Value" (Presentation to American Real Estate Society), Monterey, CA: 4/09

Seminar Panel Member - "Considerations for Effective Court Testimony", Appraisal Institute, Woodside, CA: 5/09

Seminar Panel Member - "Skills for Expert Witness Testimony", Federal Agency Update, Las Vegas, NV: 1/10

Seminar Panel Member - "Involuntary Acquisition of Property in a Down Market", Federal Agency Update, Las Vegas, NV: 1/10

Seminar Moderator/Panel Member - "Recognizing Uncertainty and Valuing Flexibility in Appraisals", XXV Union of PanAmerican Associations of Valuers Congress, Miami, FL: 11/10

Presenter - "Condemnation Appraising" (Presentation to China Institute of Real Estate Appraisers and Agents), Beijing, China: 7/11

Presenter - "Assessed Value as the Basis of Property Tax" (Presentation to China Institute of Real Estate Appraisers and Agents), Beijing, China: 7/11


**Publications**

Co-Author: "Valuation of Long Term Leases" - *The Appraisal Journal*, Volume LVII, No. 4 (October 1989)

Developer, *Condemnation Appraising: Basic Principals and Applications*, Appraisal Institute Course (1998)

Contributing Editor to *Real Estate Valuation in Global Markets* (2010)

Contributor to *The Appraisal of Real Estate, 11th Edition* (1996), *12th Edition* (2001), and *13th Edition* (2007-2008)

Contributor to *The Dictionary of Real Estate Appraisal, Fourth Edition* (2002), and *Fifth Edition* (2009)

Development Team Member: *Litigation Appraising: Specialized Topics and Applications*, Appraisal Institute Course (1999)

Contributing Editor to *Introduction to Conservation Easement Valuation* , Appraisal Institute Seminar (2009)

Contributing Editor to *Uniform Appraisal Standards for Federal Land Acquisitions: Practical Applications for Fee Appraisers*, Appraisal Institute Seminar (2002)

Contributing Editor to *Rates and Ratios: Making Sense of GIMs, OARs, and DCF*, Appraisal Institute Seminar (2002)

Contributing Editor to *Office Building Valuation: A Contemporary Perspective*, Appraisal Institute Seminar (2006)

Development Team Member: *General Appraiser Income Approach, Parts 1 and 2*, Appraisal Institute Courses, (2006-2007)

Contributing Editor to *Litigation Skills for the Appraiser: An Overview*, Appraisal Institute Seminar (2007)

Contributing Editor to *An Introduction to Valuing Green Buildings*, Appraisal Institute Seminar (2008)

Contributing Editor to *Capitalization Theory and Techniques Study Guide, Third Edition*, Appraisal Institute (2008)

Contributing Editor to *Condemnation Appraising - Principles and Applications*, Appraisal Institute Course (2008)

Development Team Member: *Valuation for Financial Reporting*, Appraisal Institute Seminar (2008)

Development Team Member: *Advanced Income Capitalization*, Appraisal Institute Course (2009-2010)

Co-Author: *Materialization of Protection of Property Rights*, Presented to 24th Pan Pacific Congress of Appraisers, Valuers, and Counselors, Seoul, Korea (2008)

Contributing Editor to *Valuation in Challenging Markets,* Appraisal Institute Course (2011)


**Other**

Stephen D. Roach, MAI, SRA has completed the *Litigation Professional Development Program* and is listed on the Litigation Professional Development Program Registry on the Appraisal Institute's Web Page

# Cody F. Knox

**Educational Background**

B.A. degree in Film, University of California Santa Barbara                 2001
Professional Courses Completed:
    Appraisal Institute:
        Advanced Income Capitalization                                  2010
        Advanced Sales Comparison & Cost Approaches             2009
        Apartment Valuation                                             2009
        Market Analysis & Highest & Best Use                      2005
        Basic Income Capitalization                                   2006
        15-Hour National USPAP                                        2006

**Professional Affiliations**

Associate Member - Appraisal Institute
California Certified General Real Estate Appraiser (No. AG044445)

**Appraisal Experience**

Staff Appraiser - Jones, Roach & Caringella, Inc.
Senior Analyst - Integra Realty Resources Portland, 2 years
Staff Appraiser - PGP Valuation Portland, 2 years

**Types of Appraisals**

| | | |
|---|---|---|
| Community Shopping Centers | Commercial Subdivisions | Auto Service Properties |
| Commercial/Retail Buildings | Industrial Buildings | Single-Family Residences |
| Historic Office Buildings | Leasehold & Leased Fee Estates | Vacant Land |
| Eminent Domain/Partial | Mixed-Use Properties | Regional Malls |

**Partial List of Clients - Attorneys and Individuals**

| | | |
|---|---|---|
| Glenn, Wright, Jacobs & Schell | Saucy & Saucy | Zimmer & Bunch |
| Chapman Law Firm | Colliers, Lanard & Axileund | |
| Cann Attorneys at Law | Singer Properties | |

**Partial List of Clients - Corporations and Banks**

| | | |
|---|---|---|
| Zions First National Bank | US Bank | City Center Parking |
| Wells Fargo Bank | Riverview Community Bank | SKWK LLC |
| Regents Bank | Rite Aid Corporation | Shore Bank Pacific |
| Bank of America | Vetspring Capital Solutions LLC | West Coast Bank |
| Columbia Credit Union | New York Life Investment Man- | Black Helterline LLC |
| M&T Bank | agement LLC | National Mortgage |
| Columbia Community Bank | Kennedy Funding, Inc. | IQ Credit Union |
| First Republic Bank | Kimco Realty Corporation | Banner Bank |
| Bank of the Cascades | Standard Insurance Co. | Lake Forest Bank |
| Capital Pacific Bank | Union Bank of California | Weikel Rancho Bernardo LP |
| Lewis & Clark Bank | Farmers & Merchant Bank | |

**Partial List of Clients - Public Agencies**

| | | |
|---|---|---|
| C.A. Dept. of Transportation | City of San Diego | FDIC |
| United States Navy | City of Beaverton | Bureau of Reclamation |